[File No. 6514.]

STATE OF NORTH DAKOTA EX REL. JOHN CONRAD, R. D. Ward, W. H. Kadell, C. Gibson, Oscar Herum, John Dawson, and Harrison Garnett, Petitioners, v. WILLIAM LANGER, John Gray, John N. Hagan, Berta Baker, Each Individually and as Members of the State Board of Equalization, and Owen T. Owen, Individually, and as a Member of the State Board of Equalization, and as State Tax Commissioner, Respondents.

(277 N. W. 504.)

168

Opinion filed December 1, 1937.   On Petition for Rehearing February 7, 1938.

*Horace C. Young,* for petitioners.

*P. O. Sathre,* Attorney General, *Paul Campbell* and *Owen T. Owen,* for respondents.

CHRISTIANSON, Ch. J.   Application is made to this court by private relators, as citizens and taxpayers of the state, for a prerogative writ of mandamus to compel the respondents, as members of the State Board of Equalization, "to convene and correct the 1937 state levy by eliminating the levies made for the mill and elevator bond payment fund, milling bond payment fund and real estate bond payment fund;" and to compel the respondent, Owen T. Owen, as State Tax Commissioner, "to certify to the county auditors the 1937 state tax levy at 4 mills instead of 6.1 mills."

In the petition for the writ it is alleged:

"That under the provisions of Chapter 235 of the Session Laws of 1929, the state property tax is required to be levied at the annual meeting of the State Board of Equalization, in August of each year; that the rate of such tax is required to be certified by the State Tax Commissioner. to each county auditor on or before the 15th day of September, annually; that the levy is required to be made in specific amounts, the rate to be determined by the State Board of Equalization."

"That under the provisions of § 174 of the Constitution of the State of North Dakota, and § 3 of Chapter 235 of the Session Laws of 1929, the aggregate rate of levy for all state purposes, exclusive of interest on the public debt of the state, may not exceed 4 mills on the dollar of the net taxable assessed valuation of all property in the state, as equalized by the State Board for the current year."

It is further alleged that the net taxable assessed valuation of all property in the state subject to taxation during the year 1937 as equalized and determined by the State Board of Equalization is $471,863,495.00.

It is further alleged that the maximum amount that may be levied for all state purposes during the year 1937, under § 174 of the state constitution and § 3, chap. 235, Laws 1929, is $1,887,453.98, "with such additional amount as may be levied for interest on the public debt."

It is further alleged that the respondents, the State Board of Equalization, made the following levy for state purposes for the year 1937:

| | |
|---|---:|
| General Fund | $1,793,081.28 |
| Capitol Building Fund | 94,372.69 |
| Mill and Elevator Construction Bond Payment Fund | 401,087.97 |
| Real Estate Bond Payment Fund | 235,971.74 |
| Milling Bond Payment Fund | 254,806.78 |
| Real Estate Bond Payment Fund | 99,091.00 |
| | $2,878,411.46 |

It is also alleged that such state levy was certified to the county auditors by the state tax commissioner as follows:

|  | Mills |
|---|---|
| General Fund Levy | 3.80 |
| State Bond Interest: | |
| Mill & Elevator Bond Payment Fund | 0.85 |
| Milling Bond Payment Fund | 0.54 |
| Real Estate Bond Payment Fund | 0.21 |
| Total State Board Levies | 5.40 |
| Legislative Levies: | |
| State Capitol Building Fund | 0.20 |
| Real Estate Bond Payment Fund | 0.50 |
| Total State Rate of Levy | 6.10 |

The relators have invoked the original jurisdiction of this court. It is well settled that this jurisdiction will not be exercised to vindicate private rights regardless of their importance; it is reserved for the use of the state itself when it appears to be necessary to vindicate or protect its prerogatives or franchises or the liberties of its people.

"The jurisdiction," said Morgan, Ch. J., (State ex rel. Steel v. Fabrick, 17 N. D. 532, 536, 117 N. W. 860), "is not to be exercised unless the interests of the state are directly affected. Merely private rights are not enough on which to base an application for the issuance of original writs by this court. The rights of the public must appear to be directly affected. The matters to be litigated must not only. be publici juris, but the sovereignty of the state, or its franchises or prerogatives, or the liberties of its people, must be affected. Before the court will, in the exercise of its original jurisdiction, issue prerogative writs, there must be presented matters of such strictly public concern as involve the sovereign rights of the state, or its franchises or privileges. The often-quoted statement of the rule as to the original jurisdiction of the supreme court to issue writs of a prerogative character, as given in Atty. Gen. v. Eau Claire, 37 Wis. 400, is well expressed and clear: 'To warrant the assertion of original jurisdiction here, the interest of the state should be primary and proximate, not indirect or remote; peculiar, perhaps, to some subdivision of the state, but

affecting the state at large in some of its prerogatives, raising a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state in its sovereign character.' This statement of the rule has been approved in many cases in this court."

It is true that a private relator, as a citizen and taxpayer, ordinarily has sufficient interest to invoke this court's prerogative jurisdiction. Still the relator's relation to the proceeding is in a sense nominal, and the real plaintiff is the state. The private relator, in his capacity as a citizen and taxpayer, merely informs the court of the infringement which has been or is about to be made upon the sovereignty of the state, or its franchises or prerogatives, or the liberties of its people, and the court by virtue of the power granted by the Constitution commands that the suit be brought by and for the state, even though the Attorney General may refuse to bring the action, or consent to its institution. State ex rel. Linde v. Taylor, 33 N. D. 76, 156 N. W. 561.

This proceeding is predicated fundamentally upon the premise that the members of the State Board of Equalization have failed to perform, and have disregarded, the duties enjoined upon them by law by levying taxes in an amount which they are forbidden by the constitution to levy. If the contention of the relators is well founded then it would seem that the state itself in some of its prerogatives, is affected in a very real sense. If the contention of the relators is well founded, then there has been extended a tax levy for state purposes exceeding by more than fifty per cent the constitutional limit. If this is true then serious consequences may and probably will result in carrying on the operation of some of the departments of government and institutions of the state.

The court's jurisdiction has not been challenged. In fact it seems to be conceded by the respondents that the matter is one within, and requiring the exercise of, the original jurisdiction. But clearly the only contention that does furnish a basis for the exercise of the original jurisdiction is the one that the levy is inhibited by the provisions of the state constitution.

If nothing more were presented by the relators than a charge that the State Board of Equalization had committed certain errors and in certain particulars had deviated from statutory provisions, then, un-

der the circumstances of this case, no cause would·be presented requiring or justifying the exercise of the original jurisdiction.

The relators invoke and rely upon the decision of this court in State ex rel. Lenhart v. Hanna, 28 N. D. 583, 149 N. W. 573. But the facts in that case were quite different from those presented here. In that case the State Board of Equalization had not completed its labors; the Board had not taken final adjournment; the state tax levy had not been certified to the counties; such levy was still subject to such further action as the Board might see fit to take. In the action that had been taken the Board had failed to make a levy for 1.8 mills for the educational institutions of the state pursuant to a statute providing for such levy. The writ of mandamus was sought there to compel the Board of Equalization to comply with the latter statute and to make and certify a levy of a tax for the educational institutions in accordance with the legislative enactment. The situation here is quite different. It is not sought here to compel the State Board of Equalization to include in the state levy a certain item for which the legislative assembly has provided that a levy shall be made. It is sought to have the Board reconvene, revise and correct action formerly taken,—action which so far as the State Board of Equalization is concerned, was intended to be final,—and to·compel that Board to deduct from the levy as made certain items or amounts that were included therein.

The relators ask that a writ of mandamus issue to compel the respondents, members of the State Board of Equalization, to reconvene and make certain changes in the levy which they formerly made and to compel the State Tax Commissioner to make similar changes in the levy which he heretofore has certified to the several counties, and to certify to the counties such changed levy.

The purpose of a writ of mandamus is to enforce the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station, and where there is no other adequate remedy. In absence of other adequate remedy, a public officer will be compelled by mandamus to proceed either to perform a ministerial duty or to exercise a discretionary one when the duty is clearly prescribed as imperative. 38 C. J. 592. But "mandamus is ordinarily a remedy for official inaction," and is not the proper remedy to impel "the undoing of acts already done or the correction of wrongs already perpetrated."

38 C. J. p. 592; 19 Am. & Eng. Enc. Law, 2d ed. p. 743; 19 Standard Proc. p. 167. Mandamus may not be employed as an appeal or writ of error. 19 Standard Proc. p. 167.

Was the action of the State Board of Equalization, which it is sought in this proceeding to have disregarded or set at naught, so clearly contrary to the duty imposed upon the State Board of Equalization that in the eyes of the law it must be considered that the State Board of Equalization has not acted at all? Unless this question can be answered in the affirmative, no cause is presented which would require or justify this court in issuing a prerogative writ of mandamus. And this question can be answered in the affirmative only provided the levy which the State Board of Equalization made violated § 174 of the state constitution. Mere error of judgment on the part of the State Board of Equalization or deviation from statutory direction in the performance of their duties would not present a situation justifying or authorizing the issuance of a prerogative writ of mandamus compelling the State Board of Equalization to reconvene and vacate its former action and then proceed to make a levy of taxes the same as though its former action had never been taken. The question, therefore, resolves itself to this: Is the levy made by the State Board of Equalization in excess of the four mill limit prescribed by § 174 of the state constitution?

Section 174 of the Constitution of North Dakota reads as follows: "The legislative assembly shall provide for raising revenue sufficient to defray the expenses of the state for each year, not to exceed in any one year four mills on the dollar of the assessed valuation of all taxable property in the state, to be ascertained by the last assessment made for state and county purposes, and also a sufficient sum to pay the interest on the state debt."

This section is found in Article 11 of the Constitution relating to "Revenue and Taxation." Both sides agree that the first two items in the tax levy under consideration here, namely, "General Fund" and "Capitol Building Fund" concededly fall within the provisions of § 174 of the state constitution. The four latter items in the levy, namely, the item for "Mill and Elevator Construction Bond Payment Fund," the two items for "Real Estate Bond Payment Fund" and the item for "Milling Bond Payment Fund" are, as they indicate,

levies made to provide funds for payments to be made on account of certain bond issues.

Do these four latter items come within the purposes for which § 174 of the state constitution says that the state tax levy in any one year may not exceed four mills? If they do, the levy is in excess of the constitutional limit; if they do not, the constitutional limit has not been exceeded.

The bonds in question were issued under the provisions of § 182 of the state constitution as amended. This section is found in Article 12 of the constitution relating to "Public Debt and Public Works." As originally adopted this section read as follows:

"Sec. 182. The state may, to meet casual deficits or failure in the revenue, or in case of extraordinary emergencies, contract debts, but such debts shall never in the aggregate exceed the sum of two hundred thousand dollars, exclusive of what may be the debt of North Dakota at the time of the adoption of this constitution. Every such debt shall be authorized by law for certain purposes to be definitely mentioned therein, and every such law shall provide for levying an annual tax sufficient to pay the interest semi-annually, and the principal within thirty years from the passage of such law, and shall specially appropriate the proceeds of such tax to the payment of said principal and interest, and such appropriation shall not be repealed nor the tax discontinued until such debt, both principal and interest, shall have been fully paid. No debt in excess of the limit named shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war, or to provide for public defense in case of threatened hostilities; but the issuing of new bonds to refund existing indebtedness, shall not be construed to be any part or portion of said two hundred thousand dollars."

The section was amended in 1918, and was amended again in 1924. So far as concerns the question involved here, the changes made by the amendment in 1924 are not material. In its present form the section reads as follows:

"Sec. 182. The state may issue or guarantee the payment of bonds, provided that all bonds in excess of two million dollars shall be secured by first mortgage upon real estate in amounts not to exceed one-half of its value; or upon real and personal property of state owned

utilities, enterprises or industries, in amounts not exceeding its value, and provided further, that the state shall not issue or guarantee bonds upon property of state owned utilities, enterprises or industries in excess of ten million dollars.

"No further indebtedness shall be incurred by the state unless evidenced by a bond-issue, which shall be authorized by law for certain purposes, to be clearly defined. Every law authorizing a bond issue shall provide for levying an annual tax, or make other provision, sufficient to pay the interest semi-annually, and the principal within thirty years from the date of the issue of such bonds and shall specially appropriate the proceeds of such tax, or of such other provisions to the payment of said principal and interest, and such appropriation shall not be repealed nor the tax or other provisions discontinued until such debt, both principal and interest, shall have been paid. No debt in excess of the limit named herein shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war or to provide for the public defense in case of threatened hostilities."

Following the amendment of § 182 made in 1918 the state engaged in what has become known as "The State Industrial Program." It established the Bank of North Dakota and provided for a rural credit system. Laws 1919, chaps. 147, 148, 154. It established and constructed a state mill and elevator. Laws 1919, chap. 152. Bonds were issued and sold to provide funds for the construction of the mill and elevator. Laws 1919, chap. 153. Bonds were issued and sold to provide funds for the purpose of making real estate loans. Chapter 154, Laws 1919; chap. 292, Laws 1923. Bonds were authorized to be issued, and were issued and sold, to provide funds with which to purchase grain in carrying on the activities of the state mill and elevator; such bonds being known as "milling bonds." Laws 1923, chap. 291. Each of the acts authorizing the issue of bonds contained provisions for the levy of a tax to meet any deficiency that might occur in the bond payment funds.

The act authorizing the first series of real estate bonds provided as follows: "If at the time of the annual meeting of the State Board of Equalization, the moneys in the real estate bond payment fund shall appear to the State Treasurer to be insufficient to meet the payments

of interest or principal upon said bonds accruing within a period of one year thereafter, he shall so inform the State Board of Equalization, which shall thereupon proceed to include in the annual tax levy, such tax as in its judgment shall be necessary to meet the indicated deficiency, and the proceeds of such tax shall be placed by the State Treasurer in said fund." (Laws 1919, § 13, chap. 154.)

The act of 1923 authorizing a further issue of real estate bonds provided: "If at the time of the annual meeting of the State Board of Equalization, the moneys in the real estate bond payment fund shall appear to the State Treasurer to be insufficient to meet the payment of interest upon said bonds accruing within a period of one year thereafter, or to meet any deficiency existing in the bond amortization surplus fund, he shall so inform the State Board of Equalization, which shall thereupon proceed to include the annual tax levy, such tax as in its judgment shall be necessary to meet the indicated deficiency, and the proceeds of such tax shall be placed by the State Treasurer in said fund." (Laws 1923, § 12, chap. 292.)

In 1929 the legislative assembly enacted a measure which provided in part as follows: "The Industrial Commission shall annually prepare a statement in July of each year showing the condition of the real estate bond sinking fund and the real estate bond interest payment fund. Such statement shall be approved by the State Treasurer and shall be presented to the State Board of Equalization at its annual meeting of the same year, together with the recommendation of the Industrial Commission. If an actual deficit exists in either or both of said funds, on July 1, 1929, or annually thereafter, it shall be mandatory upon the said Board to make an annual levy of taxes sufficient to make good the deficit in such fund, including a levy to restore said fund to solvency as hereinafter defined, on account of depletion of said fund or funds prior to the adoption of this act. . . ." (Laws 1929, § 3, chap. 182.)

The law providing for the issuance of the mill and elevator construction bonds provided: "Whenever it shall appear to the Board of Equalization from the information contained in any statement delivered to it by the Industrial Commission at an annual meeting of said Board, as provided in § 10 above, that there will mature, within a period of five years from such annual meeting, any of the bonds pro-

vided for in this act, the Board of Equalization shall thereupon, at such annual meeting, levy a tax in an amount equal to one-fifth of the amount of the principal of such bonds; provided, however, that in determining the amount of such tax, the Board of Equalization shall take into account whatever moneys, if any, shall have been paid to the State Treasurer by the Industrial Commission for the specific purpose of paying the principal of said bonds when due, as provided in § 9 of this act. . . ." (Laws 1919, § 11, chap. 153.)

The law providing for the issuance of the milling bonds provided in part as follows: "Whenever it shall appear to the Board of Equalization from the information contained in any statement delivered to it by the Industrial Commission at any annual meeting of said Board, as provided in § 6 above, that there will mature, within a period of five years from such annual meeting, any of the bonds provided for in this act, the Board of Equalization shall thereupon, at such annual meeting, levy a tax in an amount equal to one-fifth of the amount of the principal of such bonds; provided, however, that in determining the amount of such tax, the Board of Equalization shall take into account whatever moneys, if any, shall have been paid to the State Treasurer by the Industrial Commission for the specific purpose of paying the principal of said bonds when due, as provided in § 5 of this act. . . ." (Laws 1923, § 7, chap. 291.)

All the bonds in question were issued under the provisions of § 182 of the constitution as amended.

Is a levy made for the purpose of providing funds for payment of the principal of these bonds, a levy to raise revenue "to defray the expenses of the state for each year" within the purview of § 174 of the constitution?

Section 174 of the constitution has no application to a levy of taxes made pursuant to law enacted by the legislative assembly for the purpose of providing funds for the payment of the principal of state bonds. The section is restricted to revenue to be raised "to defray the expenses of the state for each year," and "a sufficient sum to pay the interest on the state debt." The section is found in article 11 of the constitution relating to "Revenue and Taxation." The several sections in that article deal solely with taxation. Article 12 of the constitution deals with "Public Debt and Public Works." Section 182 of

the constitution is the first section of article 12. This section, in its original form, provided that every law authorizing the state to contract a debt "shall provide for levying an annual tax sufficient to pay the interest semi-annually and the principal within thirty years from the passage of such law and shall specially appropriate the proceeds of such tax to the payment of said principal and interest and such appropriation shall not be repealed nor the tax discontinued until such debt, both principal and interest, shall have been fully paid." The section as amended provides that "every law authorizing a bond issue shall provide for levying an annual tax or make other provision sufficient to pay the interest semi-annually and the principal within thirty years from the date of the issue of such bonds and shall specially appropriate the proceeds of such tax or of such other provisions to the payment of said principal and interest and such appropriation shall not be repealed nor the tax or other provisions discontinued until such debt, both principal and interest, shall have been paid."

Section 174 of the constitution imposes upon the legislative assembly a duty,—the duty of providing "for raising revenue sufficient to defray the expenses of the state for each year, not to exceed in any one year four mills on the dollar of the assessed valuation;" also, "a sufficient sum to pay the interest on the state debt." The term "expenses of the state" as employed in § 174 of the constitution has reference to the general operating expenses of the state government for the fiscal year and was not intended to include revenues raised for the payment of the principal of a debt or bond authorized under § 182 of the constitution.

Section 182 is complete in every detail and specifically requires that before a debt is contracted or a bond issued provision be made for the raising of revenue. for the payment of such debt or bond at maturity and the interest thereon. The section provides that before a debt is contracted or a bond issued a law must be enacted which, among other things, levies a tax or makes other provision for the payment of the principal and interest, and such law cannot be repealed, nor can the tax or other provisions be discontinued until the debt, both principal and interest, is fully paid.

There was obviously no occasion to place upon each legislative assembly the duty of making provision for the raising of revenue for the

payment of the principal of such debt or bond. Such provision had already been made by the legislative assembly that enacted the law authorizing the debt or the bond and under the express terms of section 182 it was beyond the power of a subsequent legislative assembly to repeal such act or to discontinue the tax. Ordinarily a tax for the payment of the principal of a bond is not levied in any one year but over a term of years and the proceeds placed in a sinking fund to be available when the bond becomes due. In the ordinary acceptation of the term the placing of moneys in a fund to be expended at some future date would not be deemed an expense for the year the money was placed in the fund. The term "expenses of the state for each year" has reference to the general expenses of the state for each fiscal year.

It is true § 174 says that the legislative assembly shall also provide for raising a sufficient sum to pay the interest on the state debt; but payment of interest (which under the provisions of § 182 must be semi-annually) would represent an actual expenditure of moneys required to be made during each year, and would in a sense be a part of the general operating expense of the state government for the year during which the payments must be made, so there was abundant reason for placing this provision in § 174 (notwithstanding the fact that § 182 provided that the law authorizing the debt or the issuance of the bond must provide a levy for the payment of such interest), because if § 174 had not so provided it might have been argued with much force that the payment of interest on state debts or bonds was a contemplated annual expenditure of funds and, hence, would constitute part of the expenses of the state for each year and be within the four mill limitation.

In support of their contention that taxes levied for the payment of the principal of state bonds are within the four mill limitation of § 174 of the state constitution relators cite certain decisions from the state of Colorado. The constitutional provision of Colorado, involved and construed in those decisions, is quite different from § 174. The Colorado constitutional provision was to the effect that "the rate of taxation on property for *state purposes* shall never exceed four mills on each dollar of valuation." Obviously "state purposes" is a broader term than "expenses of the state."

The application for a writ of mandamus must be and it is denied.

BURR, MORRIS and NUESSLE, JJ., concur.

## On Petition for Rehearing.

CHRISTIANSON, Ch. J. The relators have petitioned for a rehearing. In their petition they assert that certain objections which they raised as to the validity of the 1937 state tax levy, were not determined in the former opinion; and, they say that it is "important that all questions relating to the validity of the 1937 state tax levy be determined at this time." It is also said that "the uncertainty as to the validity of the levy will of necessity result in considerable litigation and numerous suits." The contentions thus advanced by the relators seem to be predicated upon the theory that this is what is ordinarily known as a "taxpayer's suit," and they would have merit if this were so, but this is not a "taxpayer's suit," as that action is known in our jurisprudence. What is known as a "taxpayer's suit" may not be instituted in the Supreme Court. The Supreme Court has no jurisdiction to hear and determine it except on appeal. Such suit must be brought in the district court which, by the constitution, is vested with "original jurisdiction . . . of all causes both at law and equity." The jurisdiction vested in a district court extends to all suits whether brought by an individual for himself or for a class and whether it is brought against an individual, against public officers, against a political subdivision or against the state itself. The original jurisdiction which the constitution vests in the Supreme Court does not extend to an action or proceeding instituted by or for the benefit of private individuals to vindicate private rights even though such action or proceeding is predicated upon an alleged invasion of rights by public officers. In considering the respective grants of jurisdiction to the district court and to the Supreme Court in Guilford School Dist. v. Dakota Trust Co. 46 N. D. 307, 178 N. W. 727, this court said:

"Our constitution provides:

'The Supreme Court, except as otherwise provided in this Constitution, shall have appellate jurisdiction only, which shall be coextensive with the state, and shall have a general superintending control

over all inferior courts under such regulations and limitations as may be prescribed by law.' N. D. Const. § 86.

" 'It shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, injunction, and such other original and remedial writs as may be necessary to the proper exercise of its jurisdiction, and shall have authority to hear and determine the same; provided, however, that no jury trial shall be allowed in said Supreme Court, but in proper cases questions of fact may be sent by said court to a district court for trial.' N. D. Const. § 87.

" 'The district courts shall have original jurisdiction, except as otherwise provided in this Constitution, of all causes both at law and equity, and such appellate jurisdiction as may be conferred by law. They and the judges thereof shall also have jurisdiction and power to issue writs of habeas corpus, quo warranto, certiorari, injunction, and the other original and remedial writs, with authority to hear and determine the same.' N. D. Const. § 103.

"There can be no difference of opinion as to the intention of these constitutional provisions. They clearly define the proper sphere of the district and supreme courts. As was said by this court in State ex rel. Poole v. Nuchols, 18 N. D. 233, 236, 119 N. W. 632, 20 L.R.A. (N.S.) 413: 'These sections (Const. Sections 86 and 87) constitute a grant of power and are restrictive in their terms. Hence this court possesses such jurisdiction, and only such, as is either expressly or by necessary implication granted to it by said sections.' By the plain terms of these sections the Supreme Court is precluded from exercising original jurisdiction, except in those particular matters wherein the Constitution expressly confers such jurisdiction."

It has been definitely settled and declared by the decisions of this court that the original jurisdiction of the Supreme Court can be invoked only in behalf of and in the name of the state itself. Even when instituted by a private relator it is not the private relator's suit; but is the suit of the state.

Considerations which will warrant or require the exercise of equity jurisdiction or entitle a party to invoke extraordinary remedies, do not of themselves operate to bring a controversy within the original jurisdiction of the Supreme Court. That jurisdiction can be invoked

and exercised only when a cause is presented of the character to which the jurisdiction applies.

This court has repeatedly declared that the original jurisdiction may be exercised only where the sovereignty of the state or its franchises or prerogatives or the liberties of its people are affected. To repeat, "before the court will, in the exercise of its original jurisdiction, issue prerogative writs there must be presented matters of such strictly public concern as involve the sovereign rights of the state or its franchises or privileges. . . . To warrant the assertion of original jurisdiction here, the interest of the state should be primary and proximate, not indirect or remote; peculiar, perhaps, to some subdivision of the state, but affecting the state at large in some of its prerogatives; raising a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state in its sovereign character." State ex rel. Steel v. Fabrick, 17 N. D. 532, 536, 117 N. W. 860.

The original jurisdiction does not depend upon the number of parties interested, or upon the amount in controversy, but upon the nature of the questions involved and the rights affected. The character of an original proceeding, and the distinction between a taxpayer's action and an original proceeding in the Supreme Court are well pointed out by the Supreme Court of Wisconsin in State ex rel. Bolens v. Frear, 148 Wis. 456, 134 N. W. 673, 135 N. W. 164, L.R.A.1915B, 569, Ann. Cas. 1913A, 1147.

The Wisconsin court said:

"This transcendent jurisdiction is a jurisdiction reserved for the use of the state itself when it appears to be necessary to vindicate or protect its prerogatives or franchises or the liberties of its people; the state uses it to punish or prevent wrongs to itself or to the whole people; the state is always the plaintiff and the only plaintiff, whether the action be brought by the Attorney General, or, against his consent, on the relation of a private individual under the permission and direction of the court. It is never the private relator's suit; he is a mere incident; he brings the public injury to the attention of the court, and the court, by virtue of the power granted by the Constitution, commands that the suit be brought by and for the state. The private relator may have a private interest which may be extinguished

(if it be severable from the public interest), yet still the state's action proceeds to vindicate the public right. The fact that in many cases, as for example cases of unlawful imprisonment, the private wrong and the public wrong are so closely identified that the ending of the private wrong necessarily puts an end to the public wrong, makes no difference with the principle.

"These propositions, if correct, and we believe they are, demonstrate very clearly that there can be no such thing as a taxpayer's action (as that action is known in the circuit courts) brought in the Supreme Court within the original jurisdiction. The philosophy of the taxpayer's action in the circuit court is that the taxpayer is a member of a municipal corporation, who, by virtue of his contributions to the funds of the municipality, has an interest in its funds and property of the same general quality as the interest of a stockholder in the funds of a business corporation, and hence when corporate officers are about to illegally use or squander its funds or property he may appeal to a court of equity on behalf of himself and his fellow stockholders (i. e. taxpayers) to conserve and protect the corporate interests and property from spoliation by its own officers.

"The taxpayer himself is the actual party to the litigation and represents not the whole public, nor the state, nor even all the inhabitants of his municipality, but a comparatively limited class, namely, the citizens who pay taxes. In short, he sues for a class.

"No such thing is known in the exercise of the original jurisdiction of this court. In actions brought within that jurisdiction the state is the plaintiff and sues to vindicate the rights of the whole people."

Inasmuch as an original proceeding in this court can be maintained only where the matter involved affects the sovereign rights of the state or its franchises or prerogatives, or the liberties of the people, it naturally follows that ordinarily the application to this court for a prerogative writ should be made by the Attorney General as the chief law officer of the state. However, the failure of the Attorney General to make such application is not a bar; and where the Attorney General refuses to institute the proceeding, the court, when the facts warrant, may and will grant a private relator leave to institute it. But in no case (except in a habeas corpus proceeding) can or will the original jurisdiction be exercised on the application of a private relator unless

the Attorney General has been requested to move and has refused or unreasonably delayed so to do. State ex rel. Atty. Gen. v. Cunningham, 81 Wis. 440, 51 N. W. 724, 15 L.R.A. 561; State v. Nelson County, 1 N. D. 88, 45 N. W. 43; State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234; State ex rel. Erickson v. Burr, 16 N. D. 581, 113 N. W. 705. See also Anderson v. Gordon, 9 N. D. 480, 83 N. W. 993.

In applying to this court for leave to institute this proceeding the relators submitted as proof of the fact that they had requested the Attorney General to institute the proceeding, and that he had refused to do so, a written request to the Attorney General signed by the relators, and a statement of the Attorney General in writing refusing to accede to the request.

The request of the relators and the response of the Attorney General were as follows:

"The undersigned residents and taxpayers of the State of North Dakota request you, as Attorney General of the State of North Dakota, to commence original mandamus proceedings in the Supreme Court of the State of North Dakota, to compel the State Board of Equalization and the State Tax Commissioner to correct and reduce the 1937 state tax levy from 6.1 mills in the aggregate to 4 mills, as required by the State Constitution.

"Dated this 1st day of November, A. D. 1937.

. "John Conrad, R. D. Ward, W. H. KaDell, C. Gibson, Oscar Herum, John Dawson, and Harrison Garnett."

"The undersigned, Attorney General of the State of North Dakota, declines to commence mandamus proceedings against the State Board of Equalization and the State Tax Commissioner, as requested in the above and foregoing request."

It is apparent from the request that the only matter the relators called to the attention of the Attorney General as a basis for the proposed original proceeding was the alleged violation of § 174 of the state constitution. It was such alleged violation by the members of the State Board of Equalization that they requested the Attorney General to formally present to the Supreme Court in an original proceeding as "raising a contingency requiring the interposition of the Su-

preme Court to preserve the prerogatives and franchises of the state in its sovereign character." It was not even suggested that any action had been taken that infringed upon the sovereign rights of the state or affected its franchises or prerogatives in any other particular. Obviously persons may not present to the Attorney General a request to institute a proceeding on one state of facts or on one ground and then, upon the refusal of the Attorney General, institute a proceeding as private relators upon a wholly different state of facts or upon wholly different grounds.

In their petition in this case the relators asserted that the defendants, members of the State Board of Equalization, had levied state taxes for the year 1937 exceeding by more than fifty per cent the limit fixed by § 174 of the state constitution. This was the primary and basic ground asserted in the petition as the reason why the writ of mandamus should issue.

As has been pointed out, the alleged violation of § 174 of the state constitution was the only matter the relators called to the attention of the Attorney General as justifying or requiring him to invoke the original jurisdiction of this court. The first question therefore which presented itself for determination in this proceeding was whether the State Board of Equalization had levied taxes in excess of the limit fixed by § 174 of the state constitution. Because it was only in the event that the constitution had been thus violated that there was any claimed basis for the exercise of the original jurisdiction and the issuance of a prerogative writ to direct or control official action. State ex rel. Atty. Gen. v. Cunningham, 81 Wis. 440, 51 N. W. 724, 15 L.R.A. 561.

After careful consideration we reached the conclusion that the state tax levy for 1937 was not in excess of the limit fixed by § 174 of the state constitution. The conclusion thus reached was decisive of the proceeding. It constituted a determination of the only question that the relators had requested the Attorney General to present to this court for determination; it determined the only question that was presented by the relators in their petition, which, in the judgment of this court, warranted or justified the exercise of the original jurisdiction.

We have again considered the questions discussed and determined in

our former decision. Further reflection has not changed the views there expressed. We adhere to those views and reaffirm them. A rehearing is denied.

MORRIS, BURR and NUESSLE, JJ., concur.