**DICKINSON PUBLIC SCHOOL DISTRICT; Zap Public School District No. 14; Stanton Public School District No. 22; and Bismarck Public School District, Plaintiffs and Appellees,**

v.

**Wayne SANSTEAD, Superintendent, Department of Public Instruction, and the State of North Dakota, Defendants and Appellants.**

Civ. 870221.

Supreme Court of North Dakota.

July 19, 1988.

Mackoff, Kellogg, Kirby & Kloster, P.C., Dickinson, for plaintiffs and appellees Dickinson Public School Dist., Zap Public School Dist. No. 14, and Stanton Public School Dist. No. 22.

Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, for plaintiff and appellee Bismarck Public School Dist.

Paul F. Ebeltoft, Jr., of Mackoff, Kellogg, Kirby & Kloster, P.C., argued for plaintiffs and appellees.

Patricia May McCord Moen (argued), Asst. Atty. Gen., Bismarck, for defendants and appellants.

ERICKSTAD, Chief Justice.

Wayne Sanstead, in his official capacity as the Superintendent of the Department of Public Instruction, and the State of North Dakota [hereafter collectively referred to as the State] appeal from a district court judgment awarding $371,548.28 plus interest and costs to the Dickinson Public School District, the Stanton Public School District, and the Bismarck Public School District [hereafter collectively re-

ferred to as the School Districts].[1] We reverse and remand for entry of judgment dismissing the action.

The School Districts brought this action in July 1984 challenging the State's method of calculating per-pupil foundation aid payments under Chapter 15–40.1, N.D.C.C. The School Districts sought additional foundation aid payments for school years 1982–83 and 1983–84, as well as declaratory relief. On cross-motions for summary judgment, the district court determined that the action was not barred by sovereign immunity and that the State had failed to calculate the foundation aid payments in accordance with the statutory scheme.[2] The court awarded damages in the amount of $371,548.28. The State appeals.

■ The School Districts have moved to dismiss the appeal, asserting that the State has attempted to appeal from a non-appealable order. The State's notice of appeal states that the appeal is from the "Amended Order Granting Summary Judgment." Although the order itself is not appealable, we have held that an attempted appeal from an order or memorandum decision will be treated as an appeal from a subsequently entered consistent judgment, if one exists. *Vanderhoof v. Gravel Products, Inc.*, 404 N.W.2d 485, 488 (N.D.1987); *Olson v. Job Service North Dakota*, 379 N.W.2d 285, 287 (N.D.1985). The subsequently entered judgment in this case is consistent with the order, and we therefore treat the appeal as being from the judgment.

■ The State alleges that this action is barred by Article I, Section 9, of the North Dakota Constitution, which provides that "[s]uits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct."[3] Although the constitutional provision invests the Legislature with authority to modify or waive the State's immunity from suit, it is equally well established that no suit may be maintained against the State unless the Legislature has authorized it. *Senger v. Hulstrand Construction, Inc.*, 320 N.W.2d 507, 508 (N.D.1982).

Pursuant to its constitutional grant of authority, the Legislature has enacted Section 32–12–02, N.D.C.C., which provides that "[a]n action respecting the title to property, or arising upon contract, may be brought in the district court against the state the same as against a private person." We have construed Section 32–12–02, N.D.C.C., to bar any suit against the State which is not within the express provision of the statute. *Kristensen v. Strinden*, 343 N.W.2d 67, 74 (N.D.1983); *Stark County v. State*, 160 N.W.2d 101, 105 (N.D.1968).

The School Districts allege, and the district court concluded, that the instant action is one "arising upon contract." The School Districts further allege that the district court's determination that a contract existed is a finding of fact subject to the "clearly erroneous" standard of Rule 52(a), N.D.R.Civ.P.

Because this is a summary judgment case, the School Districts have placed themselves in a peculiar position by arguing that the "finding" is not clearly erroneous.

1. The claims of the Zap Public School District were dismissed by the district court. No appeal has been taken from that dismissal.

2. Because we conclude that the action is barred by sovereign immunity, we express no opinion on the merits of the School Districts' claim that the method employed by the State to calculate per-pupil payments was contrary to the statute.

3. Although the School Districts have named Sanstead as a party, he has been sued only in his official capacity as the Superintendent of the Department of Public Instruction. We have held that suing a state official solely in his official capacity, as opposed to suing the official in his individual or personal capacity, is tantamount to suing the State itself. *Kristensen v. Strinden*, 343 N.W.2d 67, 72 (N.D.1983). The School Districts apparently concede that Sanstead has been sued in his official capacity only and they do not seek to impose personal liability upon him. The State is therefore the real party in interest and is entitled to raise its claim of sovereign immunity. *See Kristensen, supra*, 343 N.W.2d at 74.

Summary judgment is inappropriate if a finding of fact must be made. *Brown v. North Dakota State University*, 372 N.W. 2d 879, 883 (N.D.1985); *Johnson v. Mineral Estate, Inc.*, 343 N.W.2d 778, 780 (N.D. 1984).

A review of the court's order, however, demonstrates that the court did not resolve factual disputes to reach its conclusion that a contractual relationship existed. There was no actual agreement, either written or oral, between the State and the School Districts for per-pupil payments. The existence of a contractual relationship was based solely upon the status created by Chapter 15–40.1. The district court held as a matter of law that Chapter 15–40.1, N.D. C.C., creates an express contract between the State and all school districts in the state:

> "Herein, the State of North Dakota, in the furnishing of State school aid, has entered into a unilateral contract with each of the individual school districts who have filed a claim for State school aid and have satisfied the statutory requirements for qualification of the same. While the State is clearly authorized to set the per pupil school aid, each school district having satisfied statutory requirements to receive state school aid and having thereby furnished the educational services, have fulfilled the terms of the unilateral contract and are entitled to fulfill the terms of the unilateral contract and are entitled to just compensation as authorized by statute. Such funding is an obligation of the State of North Dakota by direct appropriation of the legislature."

Our review is thus not restricted by Rule 52(a), but rather the district court's determination is a conclusion of law which is fully reviewable on appeal.

We were presented with the question of whether a statute directing disbursement of appropriated funds to governmental units created a contract with the State in *Stark County v. State, supra*. In *Stark County*, the county claimed that under the appropriate statute disbursements to counties from the Motor Vehicle Registration Fund should have been based upon the number of vehicles registered in each county, rather than upon the amount of registration fees collected in each county. The county argued that the action was one based upon contract and therefore not barred by sovereign immunity because the statute created a contract between the county and the State. We rejected the county's argument:

> "Did the statute providing for the distribution of a part of the motor-vehicle registration moneys amount to a contract between the State and Stark County?
>
> "The statute clearly does not create an express contract. The State, in an attempt to assist the counties, which are creatures of the Constitution (N.Dak. Constitution, Secs. 130, 166–173, 175), provided that a portion of the motor-vehicle registration moneys be returned to the counties for highway purposes. The State could have kept all of such moneys, as indeed it has done at times in the past." *Stark County, supra*, 160 N.W. 2d at 105.

The School Districts have not drawn our attention to any relevant distinction between *Stark County* and the circumstances presented in this case to support their argument that Chapter 15–40.1 creates an express contract between the School Districts and the State. The court in *Stark County* relied upon the fact that the Legislature could, as it had in the past, provide that all such funds be retained by the State. *Stark County, supra*, 160 N.W.2d at 105. Similarly, the Legislature could have required, as it did in the distant past, that all funding for public schools be borne by the local district, inasmuch as the State's constitutional directive to provide a uniform system of public schools is satisfied by provision for the creation of school districts and for a uniform system of schools in those districts. *Dornacker v. Olson*, 248 N.W.2d 844, 849 (N.D.1976); *Todd v. Board of Education*, 54 N.D. 235,

241, 209 N.W. 369, 371 (1926). *See* N.D. Const. art. VIII, § 2. Furthermore, we have previously stated that state aid to local school districts is a mere gratuity:

> "State aid to school districts, however, is not reimbursement for or payment for anything. It is a grant in aid and in so far as the local districts are concerned it is in the nature of a gratuity." *Zenith School District No. 32 v. Peterson*, 81 N.W.2d 764, 768 (N.D.1957).

We conclude that Chapter 15–40.1, N.D. C.C., does not create an express contract between the School Districts and the State. Thus, because this action is not one "arising upon contract" it is barred by the doctrine of sovereign immunity.[4]

■ The School Districts assert that the judgment may be sustained as a valid writ of mandamus or as a declaratory judgment. It is clear from the language of the judgment itself and from the court's prior order that the judgment was intended to award compensatory damages for past conduct by the State. It is not sustainable as a writ of mandamus or as a declaratory judgment.

The School Districts request in the alternative that we remand for further proceedings to allow them to establish their right to a writ of mandamus or declaratory relief. At this point, mandamus or declaratory relief would be inappropriate.

■ Mandamus is a remedy for official inaction, but it is not the proper remedy to compel the undoing of acts already done or the correction of wrongs already perpetrated. *State ex rel. Conrad v. Langer*, 68 N.D. 167, 175, 277 N.W. 504, 509 (1937). This action clearly seeks payment for past misdeeds, specifically per-pupil payments for school years 1982–83 and 1983–84. Even if the School Districts sought prospective relief, the relevant statutes were amended in 1985 and any writ compelling compliance with the statutes at issue here would be ineffectual.

■ Declaratory relief is unavailable for much the same reason. In *Allen v. City of Minot*, 363 N.W.2d 553, 554 n. 1 (N.D. 1985), we discussed the appropriate application of the Declaratory Judgment Act, Chapter 32–23, N.D.C.C.:

> "A declaratory judgment, by its very nature, is intended to clarify the rights of parties *before* those rights are violated. Once rights are violated, declaratory relief is inappropriate. We stated in *West Fargo Public School District No. 6 v. West Fargo Education Association*, 259 N.W.2d 612, 617 (N.D.1977), that the Declaratory Judgment Act is intended 'to provide a method whereby parties to a justiciable controversy may have it determined by a court *in advance of any invasion of right or breach of obligation*, ...'
>
> \* \* \* \* \* \*
>
> "Allen is not asking that his prospective rights under Section 40–57–04.1, N.D.C.C., be determined; rather, he is seeking redress for a violation of his rights which, he alleges, has already occurred. Under these circumstances, declaratory relief is inappropriate."

We conclude that remand for further proceedings is not required.

The judgment of the district court is reversed and we remand for entry of judgment dismissing the action.

GIERKE and VANDE WALLE, JJ., concur.

LEVINE, J., concurs in the result.

MESCHKE, Justice, concurring.

Our United States Constitution declares that government "shall make no law re-

---

**4.** *Stark County, supra,* makes it clear that an action based upon an implied contract falls within the provisions of Section 32–12–02, N.D. C.C., and is not barred by sovereign immunity. The School Districts in this case do not argue that an implied contract existed between the School Districts and the State. Even if such a contention had been raised, however, the decision in *Stark County* would require the conclusion that no implied contract existed under the undisputed facts presented in this case.

specting ... the right of the people ... to petition the government for a redress of grievances." (First Amendment).[1]

Our North Dakota Constitution directs: "All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay. Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct." N.D. Const. art. I, § 9.[2]

Sovereign immunity, a hallmark of totalitarianism, is contrary to our constitutions.

Since our forefathers fought a Revolution to repudiate an unresponsive sovereign, it is antithetical to our heritage to immunize any government from accountability for its actions.[3] Sovereign immunity is a judicial fiat of mysterious origin.[4] It has been discarded by all but a few states.[5] Neither today's case nor those tomorrow should be controlled by this discredited doctrine.[6]

While school districts, as political subdivisions, do not have all of the constitutional rights of individuals,[7] the right to seek redress of grievances is not limited to individuals and favored institutions. Recognized forms of collective action should not be denied equal access to judicial review of governmental conduct.[8]

1. "The right to petition extends to all departments of the government; the right of access to the courts is but one aspect of the right of petition." 16A Am.Jur.2d *Constitutional Law,* § 526, p. 416 (1979). It applies to civil actions and to state government; *id.,* § 528. *See De Jonge v. Oregon,* 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937).

2. This provision largely stems from the Magna Carta and goes back at least to 1790 when Pennsylvania adopted a virtually identical state constitutional provision. Sloan, *Lessons in Constitutional Interpretation: Sovereign Immunity in Pennsylvania,* 82 Dick.L.Rev. 209, 210 (1978).

Sloan undertakes "observations on both history and charts, which ineluctably demonstrate that the lawyer-draftsmen framers of the 1790 [Pennsylvania] Constitution could not possibly have said that [the state] is immune from all lawsuits without its consent." 82 Dick.L.Rev. at 211 and at 223:

"Thus, the word 'sovereign' and the concept of 'sovereign immunity' must be interpreted against the historical meaning of those terms in England, in revolutionary America of 1776–1790, and in revolutionary America of 1977. These interpretations ... do not require that Pennsylvania, *which was not deemed by its own founding fathers to be either a sovereign or an immune sovereign,* can not be sued or suffer judgment at law." (emphasis supplied).

*Compare Senger v. Hulstrand Const., Inc.,* 320 N.W.2d 507 (N.D.1982).

3. *Pruett v. City of Rosedale,* 421 So.2d 1046, 1048 (Miss.1982).

4. Borchard, *Government Liability In Tort,* 34 Yale L.J. 1, 4 (1924): "How it came to be applied in the United States of America, where the prerogative is unknown, is one of the mysteries of legal evolution."

5. When it threw out the doctrine in 1983, the Supreme Court of Oklahoma said that "... today, there are not more than five states, including Oklahoma, which have not abolished the doctrine or have not, in some manner, retreated from its universal application as an immutable concept of the law." *Vanderpool v. State,* 672 P.2d 1153, 1155 (Okla.1983).

*See generally,* Prosser & Keeton, The Law of Torts, p. 1043–1051 (5th ed. 1984).

6. Today, no one can seriously suggest that any government can do no wrong! Uninformed and unsupported past precedents of this court, applying an unexpressed and unintended limitation on access to the courts of this state, should no longer be followed. *See Kitto v. Minot Park District,* 224 N.W.2d 795 (N.D.1974) (at 799: "a crumbling legal concept"). While the legislature may "direct" the course of claims against the State and its officials, it should be clarified that all citizens are entitled to the equal protection of their Constitution against State government.

Recognized and useful deferential doctrines about discretionary functions and official immunities would be unaffected by disavowal of total governmental immunity. *See* Prosser & Keeton, *supra,* 1056–1069. *See also* Spader, *Immunity v. Liability and the Clash of Fundamental Values: Ancient Mysteries Crying Out for Understanding,* 61 Chi.Kent L.Rev. 61 (1985).

7. *See County of Stutsman v. State Historical Society of North Dakota,* 371 N.W.2d 321, 329–330 (N.D.1985).

8. *See* 16A Am.Jur.2d *Constitutional Law,* § 617, p. 566 (1979). *See generally* Tribe, American Constitutional Law, § 16–11 ("The Fundamental Right to Equal Litigation Opportunity") and § 16–45 ("Equal Access to Courts Through Concerted Action") (1988).

This case is about the accountability of an elected state executive for his administration and distribution of an important statutory appropriation. This case creates no cause for a crabbed view of the proclamation of our Declaratory Judgment Act:

"Any person ... whose rights, ... are affected by a statute, ... may have determined any question of construction or validity arising under the ... statute, ... and may obtain a declaration of rights, ... thereunder." NDCC 32–23–02.

"Person" includes a "municipal or other corporation of any character whatsoever." NDCC 32–23–13. It is settled that the State and its officials can be sued under the Declaratory Judgment Act.[9] Judgment in this action can "remove an uncertainty," a specific purpose of a declaratory judgment. NDCC 32–23–05. Insisting upon an unexpressed "future violation" test does not fit the expressed remedial purposes of a declaratory judgment. See NDCC 32–23–01, 32–23–03, and 32–23–12.

Restricting declaratory relief after foreclosing direct suit is as unbelievable as a physician putting a starving person on a reductional diet. Perversely, prescriptions for judicial review have been transformed into prohibitions.

These are my differences with the hostile procedural reasons for reversing the trial court set out in the majority opinion. Nevertheless, I concur in the result for substantive reasons.

Since 1972, successive Superintendents of the Department of Public Instruction calculated foundation aid payments to elementary and secondary schools based upon the greater number of pupils presented by the previous school year's average daily membership or the current school year's fall enrollment. The school districts claimed that the statutes unambiguously required whichever dollar figure would yield the highest payment to the school district each year. Claiming a floor premised on payment amounts, rather than calculated by pupil numbers, the school districts urged that the Superintendent's method was incorrect for the school years 1982–1983 and 1983–1984. Dickinson claimed it was underpaid by $116,424.43 for 1982–1983 and by $94,622 for 1983–1984. Bismarck claimed it was underpaid by $99,864.93 for 1982–1983. Stanton claimed it was underpaid by $527.49 for 1982–1983. The trial court sided with the school districts and directed judgment accordingly.

But, I believe that the Superintendent of Public Instruction fairly interpreted the applicable statutes, NDCC 15–40.1–07,[10] 15–40.1–08 [11] and 15–40.1–09 [12] (as they then

9. *State ex rel. Link v. Olson,* 286 N.W.2d 262, 268 (N.D.1979); *Farmers Insurance Exchange v. Nagle,* 190 N.W.2d 758 (N.D.1971); *Melland v. Johanneson,* 160 N.W.2d 107 (N.D.1968).

10. The relevant part of NDCC 15–40.1–07 said:

*"High school per-pupil payments—Amount—Proportionate payments.* There shall be paid each year from state funds to all school districts of the county operating high schools and to school districts contracting to educate high school pupils in a federal school, subject to adjustment as provided in section 15–40.1–09, payments as follows:

"1. For high schools having under seventy-five pupils in average daily membership, the amount of money resulting from multiplying the factor 1.70 times the educational support per pupil as provided in section 15–40.1–06 for each high school pupil registered in the schools each year.

"2. ....

"3. ....

"4. ....

"Every high school district shall receive at least as much in total payments as it would have received if it had the highest number of pupils in the next lower category. No school district shall receive less in foundation program per-pupil payments for the 1979–80 school year than such district would have received in such payments based upon the average enrollment in such district for the previous three school years, and *no school district shall receive less in foundation program per-pupil payments for any year thereafter than such district would have received in such payments based upon the enrollment in such district for the previous school year.* However, no payment shall be made for those pupils for whom federal agencies provide education." (emphasis supplied).

11. The relevant part of NDCC 15–40.1–08 said: *"Elementary per-pupil payments—Amount.* There shall be paid from state funds to school districts of the county operating elementary schools and to school districts contracting to

existed, before later amendments). These complex statutory directions for calcula-

educate elementary pupils in a federal school, employing teachers holding valid certificates or permits, payments based on the number of registered students at the beginning of each school year, adjusted as provided in section 15–40.1–09, as follows:

"1. For one-room rural schools there shall be paid that amount of money resulting from multiplying the factor 1.30 times the educational support per pupil as provided in section 15–40.1–06 for each of the first sixteen pupils in grades one through eight in average daily membership, and for each additional pupil in grades one through eight in average daily membership there shall be paid .9 times the educational support per pupil as provided in section 15–40.1–06, except that no payment shall be made for more than twenty pupils in average daily membership.

"2. ....
"3. ....
"4. ....
"5. ....
"6. ....
"7. ....

"No school district shall receive less in foundation program per-pupil payments for the 1979–80 school year than such district would have received in such payments based upon the average enrollment in such district for the previous three school years, and *no school district shall receive less in foundation program per-pupil payments for any year thereafter than such district would have received in such payments based upon the enrollment in such district for the previous school year.*" (emphasis supplied).

12. NDCC 15–40.1–09 said:

*"Application for payments—Verification and determination of payments for high school students—Report of county superintendent of schools—Appeal.* Immediately upon the completion of the registration of students at the beginning of each school term and in no event later than September tenth of each year, the clerk of each school district within or without this state which is claiming payments from state funds under the provisions of this chapter shall file with the county superintendent of schools a claim on a form prescribed by the superintendent of public instruction stating the number of students registered in high school and elementary grades for which payments are claimed, and such other information as may be reasonably requested by the superintendent of public instruction. Not later than December first, the superintendent of public instruction shall certify to the office of management and budget a list of the school districts and schools not operated by school districts entitled to payments from state funds, together with the amounts to which the several districts and schools are entitled. *Such certification shall include an adjustment in the amounts to which the districts and schools are entitled, based upon the difference between payments made under this chapter to such districts and schools for the previous school year as compared to the amount calculated, as provided in sections 15–40.1–07 and 15–40.1–08, upon the average daily membership during the previous school year.* For purposes of this chapter, 'average daily membership' shall mean the total days all students in a given school are in attendance, including days set aside for the North Dakota education association convention, plus any three holidays selected from those listed in subsections 2 through 10 of section 15–38–04.1 which have been decided upon after consultation with the teachers, and the total days all students are absent, divided by one hundred eighty days. School districts educating children of agricultural migratory workers or offering high school summer school programs during the months of June, July, and August shall not be restricted to payments for a one-hundred-eighty-day school term.

"Immediately upon the termination of the school term and in no event later than July fifteenth of each year, the clerk of each school district within or without this state which has received payments from state funds under the provisions of this chapter shall file with the county superintendent of schools a verified statement of the name, residence, and membership of elementary and high school students as provided for in this section, and number of units of high school work taken by each high school student enrolled during the previous school year. Such statement shall be attested to by the county superintendent of schools. The county superintendent shall investigate the validity of the statement and shall determine the residence and other qualifications of each student named in the statement filed with him. He shall certify to the superintendent of public instruction on or before September first of each year the number of enrolled students in each district in his county for the previous school year upon which any adjustment may be based as provided in this section. If any statement is disallowed in whole or in part, notice thereof and the names of students who are disallowed shall be reported to the superintendent of public instruction and to the district filing the statement. Any district may appeal to the superintendent of public instruction from the determination of the county superintendent of schools on or before September fifteenth in the year in which the determination is made. The superintendent of public instruction may change or modify the determination of the county superintendent if the evidence submitted by the district warrants a modification. *The judgment of the superintendent of public instruction shall be final."* (emphases supplied).

tions and adjustments do not appear clear and unambiguous to me. The Superintendent's interpretation strikes me as reasonable. Therefore, I would uphold the Superintendent.

"We should give great weight to a reasonable construction of a regulatory statute adopted by the administrative agency charged with [administration] of the statute. 'This court, ... has indicated its reluctance to substitute its own judgment for that of qualified experts in matters entrusted to administrative agencies:' *Amoco Production Co. v. North Dakota Ind. Comm.*, 307 N.W.2d 839, 842 (N.D.1981). 'Where the subject matter is of a technical nature, the expertise of the administrative agency is entitled to respect;' *Triangle Oilfield Services, Inc. v. Hagen*, 373 N.W.2d 413, 415 (N.D. 1985)." *Imperial Oil of North Dakota v. Industrial Commission*, 406 N.W.2d 700, 704–705 (N.D.1987) (Meschke, Justice, dissenting).

To uphold the Superintendent's reasonable interpretation of statutes under his administration, I concur in the reversal of the judgment below.