Lynn L. SCHLOESSER, Plaintiff,

v.

Donald and Joyce LARSON, d/b/a
Nova Management, Defendants,
Third Party Plaintiffs and Appellants,

v.

Robert REETZ, Robert Ehli, and Dion
Ehlis, individually, and in their capacity as employees of the State of North
Dakota by and through the North Dakota Boiler Inspection Department of
the North Dakota Workers Compensation Bureau, Third Party Defendants
and Appellees.

Civ. No. 890202.

Supreme Court of North Dakota.

July 3, 1990.

Fleck, Mather, Strutz & Mayer, P.C., Bismarck, for defendants, third-party plaintiffs and appellants; argued by Curtis L. Wike, Bismarck.

John J. Fox (argued), Asst. Atty. Gen., N.D. State Hosp., Jamestown, for third-party defendants and appellees.

GIERKE, Justice.

Donald and Joyce Larson, d/b/a Nova Management (the Larsons) appealed from a summary judgment dismissing their third-party complaint against Robert Reetz, Robert Ehli, and Dion Ehlis, individually, and in their capacity as state employees of the North Dakota Boiler Inspection Department of the North Dakota Workers Compensation Bureau (the Boiler Inspectors). We affirm.

The Larsons owned an apartment building in Bismarck that was destroyed by fire on January 27, 1988. Lynn Schloesser, a tenant in the building, sued the Larsons for damage to his personal property and additional expenses incurred as a result of the fire. The Larsons then filed a third-party complaint against the Boiler Inspectors asserting that the fire, which began in the boiler room of the apartment building, was caused by the improper installation of the boiler on combustible flooring and that the Boiler Inspectors "were negligent in failing to observe and report the improper installation of the boiler." The Larsons sought contribution or indemnity from the Boiler Inspectors for any judgment awarded in favor of Schloesser against the Larsons.[1]

On a motion for summary judgment dismissal the trial court concluded that the Larsons' action against the Boiler Inspectors in their capacity as state employees was barred by the doctrine of sovereign immunity. The court also concluded that the Larsons' action against the Boiler Inspectors, individually, was barred because there was no allegation of conduct which could be found to constitute gross negligence and, therefore, under Section 32-12.-1-15(2), N.D.C.C., the Boiler Inspectors, as state employees, could not be held personally liable.

On appeal the Larsons urge this court to abolish the doctrine of sovereign immunity, at least with respect to the circumstances of this case where the Boiler Inspectors allegedly were engaged in proprietary or ministerial functions in conducting boiler inspections. Art. I, § 9, of the North Dakota Constitution, provides in relevant part that "[s]uits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct." We have consistently construed this provision as investing the Legislature with the power to modify or waive the State's sovereign immunity from suit, and we have held that no suit may be maintained against the State

---

1. Schloesser settled his lawsuit against the Larsons and, pursuant to their stipulation, the trial court dismissed with prejudice Schloesser's action against the Larsons.

unless the Legislature authorizes it. *Dickinson Public School District v. Sanstead*, 425 N.W.2d 906 (N.D.1988); *Senger v. Hulstrand Construction, Inc.*, 320 N.W.2d 507 (N.D.1982). We refuse to invade the Legislature's domain on this issue, and, accordingly, we decline the Larsons' invitation to abrogate the State's sovereign immunity in this case.

■ The Larsons assert that application of the doctrine of sovereign immunity is a violation of their federal and state constitutional rights to procedural and substantive due process, to a legal remedy, and to receive just compensation for a public taking of their property. The Larsons have failed to cite any persuasive authority for the proposition that application of the doctrine of sovereign immunity violates constitutional guarantees. We are unpersuaded that the application of the doctrine in this case violates the Larsons' rights under the federal or state constitutions.

The Larsons also assert that sovereign immunity has been waived in this case, because Section 65–01–12, N.D.C.C., operates as a consent to be sued by the Boiler Inspectors and because the requirement that the State Boiler Inspector obtain a bond under Section 65–12–13, N.D.C.C., constitutes the acquisition of insurance and consequential waiver of sovereign immunity.

■ Section 65–01–12, N.D.C.C., provides that upon request of the Workers Compensation Bureau the Attorney General "shall defend all suits, actions, or proceedings brought against the bureau or any of its employees...." On its face, this provision does not constitute a waiver of the State's immunity or a legislative authorization to sue the State. Section 65–12–13, N.D.C.C., requires the State Boiler Inspector to furnish a $2,000 bond "conditioned upon the faithful performance of his duties." The purchase of a performance bond does not constitute acquisition of insurance or waiver of sovereign immunity. We conclude, as did the trial court, that the Larsons' rationalizations for asserting waiver of sovereign immunity are without merit.

■ The Larsons also assert that because the Boiler Inspectors represented that the boiler was properly and safely installed they should be estopped from asserting the doctrine of sovereign immunity. The Larsons have not cited any authority in support of applying the doctrine of estoppel to avoid application of the doctrine of sovereign immunity. This suggested application of the doctrine under the circumstances of this case is without merit.

■ The Larsons assert that they have a valid contract action against the Boiler Inspectors. Under Section 32–12–02, N.D. C.C., the Legislature has authorized actions "arising upon contract" to be brought against the State the same as against a private person. The Boiler Inspectors' duty to inspect the Larsons' boiler in this case arose under Section 65–12–03, N.D. C.C., which requires the State, through the Chief Boiler Inspector, to inspect all nonexempt boilers to ensure their safe operation. Under Section 65–12–06, N.D.C.C., a certificate of inspection for each inspected boiler must be issued where the inspection report certifies that the boiler is in a safe condition to be operated. Section 65–12–11, N.D.C.C., requires the owner of a boiler to pay inspection fees as determined by the Workers Compensation Bureau. The rights and obligations arising under Chapter 65–12, N.D.C.C., did not create a contractual relationship between the Larsons and the Boiler Inspectors. *See Dickinson Public School District v. Sanstead*, 425 N.W.2d 906 (N.D.1988). While the failure to make a careful inspection may constitute a breach of duty under tort principles, it does not, under these circumstances, constitute a breach of any contractual promise or obligation. There being no contractual relationship, express or implied, this action is not one "arising upon contract" for which an action can be brought against the State under Section 32–12–02, N.D.C.C.

■ The Larsons assert that they have a valid claim against the Boiler Inspectors, personally, in their individual capacities, for

being grossly negligent. Section 32–12.1–15(2), N.D.C.C., provides:

> "2. No employee of the state may be held liable in the employee's personal capacity for actions or omissions occurring within the scope of the employee's employment unless such actions or omissions constitute reckless or grossly negligent conduct, malfeasance, or willful or wanton misconduct."

As defined under Section 1–01–17, N.D.C.C., gross negligence consists in the want of slight care and diligence. This court has embellished upon that definition, defining gross negligence as constituting,

> "no care at all, or the omission of such care which even the most inattentive and thoughtless seldom fail to make their concern, evincing a reckless temperament and lack of care, practically willful in its nature." *Wysoski v. Collette*, 126 N.W.2d 896, 898 (N.D.1964).

The third-party complaint filed by the Larsons merely alleges that the Boiler Inspectors "were negligent in failing to observe and report the improper installation of the boiler" and that this conduct "constituted gross negligence."

Under Rule 56, N.D.R.Civ.P., a movant for summary judgment must show that there is no dispute as to either the material facts or the inferences to be drawn from undisputed facts and that he is entitled to judgment as a matter of law on the facts shown. *Northwestern Equipment, Inc. v. Badinger*, 403 N.W.2d 8 (N.D.1987). If the movant satisfies this initial burden, the adverse party may not rest upon mere allegations or denials but must respond by affidavit or as otherwise provided under the rule, setting forth specific facts showing that there is a genuine issue for trial. *Federal Land Bank of Saint Paul v. Asbridge*, 414 N.W.2d 596 (N.D.1987).

Robert Reetz, the Chief Boiler Inspector, submitted an affidavit to the trial court stating, in relevant part:

> "[B]oiler inspections are limited to examination of the mechanical systems and components of boilers and do not include inspections for latent fire defects or hazards.

> \* \* \* \* \* \*

> "[T]he floor area immediately adjacent to the boiler inspected was covered with a floor covering and the floor area underneath the boiler where the fire appears to have originated was covered by the boiler itself. It would not have been visually apparent to anyone conducting a routine boiler inspection that the floor area underneath the boiler may have been an unshielded combustible floor surface. The building in question was built in 1962 or 1963 and the boiler in question was probably installed at the same time and no problems were apparent for the ensuing years until the fire."

The Larsons did not submit any counter-affidavit to refute Reetz's statement that the floor area beneath the boiler was not visible in a routine inspection and that the inspections were limited to an examination of the mechanical system and components of the boiler. Consequently, the Larsons have failed to raise a genuine issue whether the Boiler Inspectors acted in a grossly negligent manner.

■ Although the determination of negligence is generally a question of fact to be determined by the factfinder, we agree with the trial court that in this case "[t]here has been no allegations of gross or willful or reckless conduct which would take the matter out of the immunity section." We conclude that, as a matter of law, the misconduct ascribed to the Boiler Inspectors in the third-party complaint, if proven, might constitute ordinary but not gross negligence. We further conclude, therefore, that the Larsons have not filed a claim for which the Boiler Inspectors could be held personally liable under Section 32–12.1–15(2), N.D.C.C.

The summary judgment dismissal is affirmed.

ERICKSTAD, C.J., and VANDE WALLE, J., concur.

MESCHKE, Justice, dissenting.

I respectfully dissent. I have said before that "[s]overeign immunity, a hallmark of totalitarianism, is contrary to our constitutions." *Dickinson Public School Dist. v. Sanstead*, 425 N.W.2d 906, 911 (N.D.1988) (Meschke, Justice, concurring).[1] Therefore, I disagree with today's decision to reconstitute the foreign relic of sovereign immunity.

I recognize that past decisions of this court have levitated the second sentence of one of our Declaration of Rights into a restriction on individual rights by immunizing state government from judicial review. But stare decisis is no more a barrier to judicial reconsideration of the "injustices of state immunity" than to abrogation of governmental immunity for the political subdivisions of the state. *Kitto v. Minot Park District*, 224 N.W.2d 795, 802–03 (N.D. 1974). Unjust and unsupportable interpretations should be reconsidered.

This perverse constitutional interpretation did not begin until *Wirtz v. Nestos*, 51 N.D. 603, 200 N.W. 524 (1924), decided more than a third of a century after the 1889 adoption of the original Declaration of Rights. The *Nestos* interpretation was an afterthought in a long opinion about the lack of vested rights in a State Guarantee Fund for insolvent banks. No history of the source of these declared Rights was traced. No meaning was given to the prime sentence of the section declaring individual rights beyond the power of the State government and legislature:

> All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have

remedy by due process of law, and right and justice administered without sale, denial or delay.

N.D.Const. art. I § 22 (now renumbered as art. I § 9). Engraftment of the foreign concept of sovereign immunity on these deeply rooted rights of individuals surely called for more thoughtful examination and interpretation than the afterthought thrown into *Nestos*. Unfortunately, no careful interpretation has been undertaken.

Our "open courts" Declaration came from comparable expressions in the Magna Carta, as I explained in *Sanstead*, 425 N.W.2d at 911, n. 2. *See* A.E. Dick Howard, *The Road from Runnymede: Magna Carta and Constitutionalism in America*, 483–86 (1968); *The Magna Charta, reprinted in* 13 North Dakota Century Code 1–9. Our form of this Declaration, including the second sentence, can be traced back to 1790 when Pennsylvania, one of our first 13 states, adopted a provision identical in wording. Scholarly study of the history of this provision has demonstrated "that the lawyer-draftsmen framers of the 1790 [Pennsylvania] Constitution could not possibly have said that [the state] is immune from all lawsuits without its consent." Sloan, *Lessons in Constitutional Interpretation: Sovereign Immunity in Pennsylvania*, 82 Dick.L.Rev. 209, 210 (1978). That history should be heeded in interpreting our "open courts" Declaration. Pennsylvania and five other states have rejected sovereign immunity under like constitutional provisions.[2] *Mayle v. Pennsylvania Dept. of Highways*, 479 Pa. 384, 388

---

1. My reasons then included the First Amendment to the United States Constitution which declares that government "shall make no law respecting ... the right of the people ... to petition the government for a redress of grievances." "The right to petition extends to all departments of the government; the right of access to the courts is but one aspect of the right of petition." 16A Am.Jur.2d *Constitutional Law* § 526 (1979). It applies to civil actions and to state governments. *Id.* § 528. *See also De Jonge v. Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937).

2. Of course, most states have retreated from the doctrine of sovereign immunity. When it threw out the doctrine in 1983, the Supreme Court of Oklahoma said that "... today, there are not more than five states, including Oklahoma, which have not abolished the doctrine or have not, in some manner, retreated from its universal application as an immutable concept of the law." *Vanderpool v. State*, 672 P.2d 1153, 1155 (Okla.1983). *See generally*, Prosser & Keeton, The Law of Torts, p. 1043–1051 (5th ed. 1984).

A.2d 709, 719, n. 80 (1978). The well reasoned construction of a like constitutional provision in another state from which ours is derived is highly persuasive. 2A N. Singer, *Sutherland Statutory Construction* § 52.04 (4th ed. 1984). North Dakota should also reject sovereign immunity.

The effect of the unstudied *Nestos* ruling and its repetitions transformed a constitutional prescription for judicial review into a prohibition. Judicial legerdemain made the subordinate sentence of a constitutional clause into the controlling sense, compromising a customary principle of constitutional interpretation that the Declaration of Rights are an instrument of limitations on state government rather than an instrument of grants to state government. *See Senger v. Hulstrand Const., Inc.*, 320 N.W.2d 507, 510 (N.D.1982) (Justice Sand, concurring). Other principles for construing constitutional language are similar to those for construing statutes. *State ex rel. Link v. Olson*, 286 N.W.2d 262, 269 (N.D.1979). Thus, we should be "guided by the common-sense principle that a [constitution] is to be read to give effect to each of its provisions, whenever fairly possible." *County of Stutsman v. State Historical Society*, 371 N.W.2d 321, 325 (N.D. 1985). It does not make sense to read the subordinate sentence in the "open courts" Declaration as supervening the meaning of the declared rights.

As I said in *Sanstead*, "[u]ninformed and unsupported past precedents of this court, applying an unexpressed and unintended limitation on access to the courts of this state, should no longer be followed. *See Kitto v. Minot Park District*, 224 N.W.2d 795 (N.D.1974) (at 799: 'a crumbling legal concept'). While the legislature may 'direct' the course of claims against the State and its officials, it should be clarified that all citizens are entitled to the equal protection of their Constitution against State government." 425 N.W.2d at 911, n. 6. I believe that sovereign immunity of the State and its officials should be discarded as unconstitutional.

The majority opinion brushes aside, as unsupported, well shaped arguments that the judicially formulated doctrine of sovereign immunity violates federal and state constitutional guarantees. Larsons conveyed the trial court's reluctance in this case: "I too question the need for sovereign immunity when [the State has] clearly taken upon [itself] a function which can be handled by private parties." Larsons quoted a recent legal encyclopedia summary "that the doctrine of governmental immunity from suit is currently in disfavor, and that today courts are disposed to hear an action against the state unless good reason stands in the way." 72 Am.Jur.2d *States, Territories, and Dependencies* § 101 (1974). Larsons cited NDCC 31–11–05(1) ("When the reason of a rule ceases so should the rule itself."), *Kitto*, 224 N.W.2d at 798, n. 3 (quoting the Amicus Brief of the then North Dakota Attorney General: "The doctrine of governmental immunity in North Dakota is legally viable but morally wrong and discriminates against those of our citizens who encounter state or local governmental entities...."), and modern decisions of the United States Supreme Court protecting property interests from governmental action by applying due process standards. Larsons concluded:

[R]igid adherence to sovereign immunity renders moot the protections set forth in Article I, section 9. The better interpretation is that while the state can regulate the method and manner of cases brought against it, denial of complete access to our state court system is unwarranted.

Today's decision also sweeps aside assurances made in *Nestos*, 200 N.W. at 535, when this rigid immunity for the State was first suggested:

The rights of the citizen to due process, to the maintenance of the legal sanctity of the obligation of a contract, to the equal protection of the law, and to the enjoyment of the rights guaranteed by the Constitution of the state and of the

nation, will be open to vindication, and their violation to redress against the commission, no less than against any person, natural or artificial. Neither the guaranty fund commission nor any officer may, under our legal system, set the Constitution at defiance; officers and private individuals alike must obey it and respect the rights of persons thereunder. No such rights are in jeopardy in the case at bar, and, if any such rights be endangered by the commission in the future, no injured person will be denied the redress or the remedies to which he is entitled under the fundamental law of the land.

Neither the State nor its officials should be above the Constitution.

"How 'uniquely amiss' it would be, therefore, if the government itself—'the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct'—were permitted to disavow liability for the injury it has begotten." *Owen v. City of Independence,* 445 U.S. 622, 651, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980) (Mr. Justice Brennan, speaking for the majority). *See* Tribe, *American Constitutional Law* § 3–26 (2d ed. 1988). "Moreover, as *Fitzpatrick v. Bitzer* [427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)] explicitly recognizes, the fourteenth amendment, also an important source of congressional power, is itself framed as a limit on state action." *Id.* at 186. *See also Howlett v. Rose,* —— U.S. ——, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). I believe that the doctrine of sovereign immunity of the State, foreign to a constitutional democracy, cannot survive serious constitutional scrutiny.[3]

It is unimaginable, in the long run, that State government can be excused from respecting individual rights guaranteed by our Constitutions. "This Constitution ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const. art. VI, cl. 2. Each North Dakota judge takes a constitutional oath: "I do solemnly swear that I will support the Constitution of the United States and the Constitution of the State of North Dakota; ...." N.D.Const. art. XI, § 4. In a democracy that safeguards individual rights in a constitution, the judiciary cannot be impotent to rectify private injustices inflicted in the name of public interests.

Reversal here would not make the State liable for the conduct of its boiler inspectors unless, by trial, they were found at fault. For these reasons, I respectfully dissent.

Levine, J., joins.

---

**3.** It is interesting to note that, when the Minnesota Supreme Court abolished the tort immunity of the State of Minnesota more than a decade ago in *Nieting v. Blondell,* 306 Minn. 122, 235 N.W.2d 597 (1975), it sidestepped consideration of constitutional guarantees:

> We have been urged to declare the doctrine of sovereign immunity to be unconstitutional as a violation of due process or equal protection.

However, because of our belief that the legislature will recognize the fairness and wisdom of allowing a wrongfully injured party to be compensated for his injuries, we decline to consider these constitutional questions.

235 N.W.2d at 603, n. 14. The constitutional arguments presented by today's appellants (which this court declines to address) are neither novel, unique, or unsupported.

In the Matter of the ESTATE of Albert F. HANSEN, Deceased.

STATE BANK OF TOWNER, Plaintiff and Appellee.

v.

Albert F. HANSEN, deceased, and Dianna M. Hansen, as the Personal Representative of the Estate of Albert F. Hansen, deceased, Defendants and Appellants.

James H. WILLIAMS and Connie D. Williams, Plaintiffs and Appellees,

v.

Dianna M. HANSEN a/k/a Dianna M. Hansen, individually and as Personal Representative of the Estate of Albert F. Hansen, deceased, Defendant and Appellant,

Steve Rolla; State Bank of Towner; G.W. Peterson d/b/a Northwest Collection Agency; the heirs, devisees and assigns of any Defendants deceased; and the assigns or successors in interest of any Defendants; and all other persons unknown claiming any estate or interest in or lien or encumbrance upon the property described in the Complaint, Defendants.

The STATE of North Dakota doing business as the Bank of North Dakota acting by and through the Board of University and School Lands, Plaintiff and Appellee,

v.

Dianna M. HANSEN, Individually and as Personal Representative of the Estate of Albert F. Hansen, deceased, Defendant and Appellant,

State Bank of Towner, Defendant and Appellee,

and

G.W. Peterson, Defendant.

Civ. Nos. 890232, 890224 and 890248.

Supreme Court of North Dakota.

July 3, 1990.

Richard P. Olson (argued), Olson, Sturdevant & Burns, Minot, for plaintiff, defendant and appellee State Bank of Towner and plaintiffs and appellees James H. Williams and Connie D. Williams.

Donald A. Anderson, Sp. Asst. Atty. Gen., Minot, for plaintiff and appellee Bank of North Dakota. Submitted on brief.

Thomas M. Disselhorst (argued), Disselhorst Law Office, Bismarck, for defendants and appellants.

MESCHKE, Justice.

These three cases stem from mortgage and tax foreclosures against the same real property once owned by Albert F. Hansen, now deceased, and Dianna M. Hansen. In *State Bank of Towner v. Hansen,* Hansen appeals from the trial court's denial of her NDRCivP 60(b) motion for relief from a judgment foreclosing the junior mortgage held by the State Bank of Towner and from the resulting foreclosure sale. In *Williams v. Hansen,* Hansen appeals from a summary judgment quieting title to the property in James H. Williams and Connie D. Williams based on a tax deed. In *State v. Hansen,* Hansen appeals from orders designating the sequence of sale and confirming the sale to foreclose the senior mortgage held by the Bank of North Dakota. Because these cases are interrelated, we resolve them in one opinion. We affirm each decision.

*Facts*

In February 1975, Albert Hansen borrowed $53,000 from the Bank of North Dakota [BND] and, to secure the debt, mortgaged 1,040 acres of property in McKenzie County. The mortgage covered both the surface and minerals. In July 1981, Albert and Dianna Hansen gave the State Bank of Towner [SBT] a $200,000 promissory note in settlement of pending legal actions. *See State Bank of Towner v. Hansen,* 302 N.W.2d 760 (N.D.1981). To secure this debt, the Hansens gave SBT a second mortgage on the surface of the property earlier mortgaged to BND. The SBT mortgage expressly provided that the minerals "shall not be subject to this mortgage." The Hansens defaulted on the debt to SBT in November 1984.

In December 1984, James H. Williams, the president of SBT, and his wife, Connie D. Williams [together referred to as Williams], purchased the property from the McKenzie County Auditor for 1983 delinquent taxes and received tax sale certificates. In February 1985, SBT sued the Hansens to foreclose its mortgage. The Hansens filed for bankruptcy and the foreclosure action was stayed. *See In re Hansen,* 77 B.R. 722 (D.N.D.1987). Meanwhile, Williams paid delinquent taxes on the property for 1984, 1985, and 1986, and received subsequent tax sale certificates.

Albert Hansen died in 1987, the bankruptcy was dismissed, and Albert's estate was substituted as a defendant in SBT's foreclosure. A trial resulted in determination of an indebtedness of $223,365.55 and a judgment of foreclosure on January 12, 1988. The foreclosure sale took place on February 16, 1988. Dianna Hansen appeared at the sale and requested that the sheriff sell the property in separate parcels. Instead, the property was sold in one parcel to SBT for $180,000. A sheriff's

certificate was issued to SBT and was recorded on February 17, 1988. The trial court signed the order confirming the foreclosure sale on February 29, 1988, and Hansen was served with the order on March 3, 1988.

In May 1988, the McKenzie County Auditor issued nine notices of expiration of time for redemption from the tax sale and served them on Hansen. The notices informed Hansen that the time for redemption would expire 90 days after service and stated the amount needed to redeem. Hansen did not redeem. On September 12, 1988, the County Auditor issued a corrected auditor's tax deed conveying the property to Williams.

BND sued to foreclose its mortgage on the Hansen property in August 1988. In January 1989, Williams sued to quiet their tax title as the owners in fee based on their auditor's tax deed. In February 1989, shortly before the time to redeem ended in SBT's foreclosure, Hansen moved under NDRCivP 60(b) for relief from that foreclosure judgment and from that February 1988 foreclosure sale. But Hansen did not redeem from the SBT foreclosure and a sheriff's deed was issued to SBT on February 17, 1989.

On March 7, 1989, BND obtained a judgment of foreclosure against Hansen for $73,252.70. Hansen then moved in the BND foreclosure for an order directing that the surface be sold first in seven separate parcels and that the minerals be sold afterward in the same sequence. The trial court ruled that the minerals should be sold

separately from the surface, but that in order to properly protect SBT as the junior lienholder as well as the homestead rights of Hansen if she wished to redeem, the minerals would be sold first in the sequence designated by Hansen and the surface would be sold second in the same sequence. The BND foreclosure sale took place on April 28, 1989, and the minerals were sold for $74,680 to James Williams, Walter F. Gehrts, Kenneth Henry, and Raymond Sharkey, original "owner/directors" of SBT.

In Williams's quiet title action, the trial court granted summary judgment on May 4, 1989, quieting title in Williams "except for a senior mortgage to [BND]." In the BND foreclosure action, a sheriff's certificate for the minerals was issued to Williams, Gehrts, Henry, and Sharkey, and, on May 15, 1989, an order confirmed that foreclosure sale to them. In the SBT foreclosure action, on May 19, 1989, the trial court denied Hansen's Rule 60(b) motion for relief from the foreclosure judgment and sale. Hansen appealed the three adverse decisions.

### State Bank of Towner v. Hansen

█ Hansen asserts that, in the SBT foreclosure action, the trial court erred in denying her NDRCivP 60(b) motion for relief from the foreclosure judgment and sale because the sheriff refused her request to sell the land in separate parcels. Under NDCC 28–23–07 and 1987 N.D.Sess.Laws Ch. 194,[1] Hansen argued that the sheriff was bound to honor her request.

---

1. At the time of the foreclosure, NDCC 28–23–07 said:

*Time and manner of sale.*—All sales of property under execution must be made at public auction to the highest bidder, between the hours of nine o'clock a.m. and four o'clock p.m. After sufficient property has been sold to satisfy the execution no more shall be sold. No sheriff or other officer, nor his deputy, holding the execution or making the sale of property, either personal or real, shall become a purchaser or be interested directly or indirectly in any purchase at such sale, and every purchase so made shall be considered fraudulent and void. When the sale is of personal property capable of manual delivery, it must be within view of those who attend the

sale and must be sold in such parcels as are likely to bring the highest price, and when the sale is of real property consisting of several known lots or parcels they must be sold separately. *The judgment debtor, if present at the sale, may direct the order in which property, real or personal, shall be sold, when such property consists of several known lots or parcels or of articles which can be sold to advantage separately, and the sheriff or other officer must follow such directions.*

1987 N.D.Sess.Laws Ch. 194 was set forth, and its relationship with NDCC 28–23–07 was discussed, in *Production Credit Ass'n v. Henderson,* 429 N.W.2d 421 (N.D.1988). In 1989, Chapter 194 was repealed and Section 28–23–07 was temporarily amended effective April 11, 1989

With her motion, Hansen presented affidavits showing that she and her representatives attended the foreclosure sale and in writing requested the sheriff to sell the property in seven separate parcels in a specified sequence "pursuant to authority given in 28–23–07 N.D.C.C." The sheriff denied the request and sold the property as directed by the foreclosure judgment. The judgment said, "since the premises constitute and were mortgaged as one entire tract, that the same be sold as one parcel and without division." The trial court denied Hansen's Rule 60(b) motion, concluding, among other things, that her motion was untimely, that her allegations supplied no reason for relief from a final and unappealed judgment, and that to grant Hansen's request for relief "would substantially prejudice [SBT] and would be inequitable under these circumstances."

▆▆▆ Hansen's motion relied on four of the six reasons for which relief is authorized by NDRCivP 60(b), (i) [mistake, inadvertence, surprise, or excusable neglect]; (iii) [fraud, misrepresentation, or other misconduct of an adverse party]; (iv) [the judgment is void]; and (vi) [any other reason justifying relief from the operation of the judgment]. Unless a judgment is void for lack of jurisdiction under Rule 60(b)(iv), a trial court must exercise sound discretion in deciding whether the movant's reasons are sufficient to set aside a final judgment or order. *First Nat'l Bank of Crosby v. Bjorgen*, 389 N.W.2d 789, 794 (N.D.1986). The movant has the burden of establishing sufficient grounds for disturbing the finality of the judgment. *Avco Financial Services v. Schroeder*, 318 N.W.2d 910, 912 (N.D.1982). For the most part, a trial court's decision on a Rule 60(b) motion will not be disturbed on appeal absent an abuse of discretion.

▆▆▆ We reject Hansen's argument that the foreclosure judgment and sale are void because the sheriff refused to sell the property in separate parcels and in the sequence that she requested, allegedly in violation of NDCC 28–23–07 and 1987 N.D. Sess.Laws Ch. 194. A judgment is void if

the court lacked subject matter jurisdiction over the action or if the court lacked personal jurisdiction over the parties. But a contention that the trial court misapplied a statute generally implicates neither subject matter nor personal jurisdiction. *Northwestern Nat'l Life Ins. Co. v. Delzer*, 425 N.W.2d 365, 368 (N.D.1988); *Production Credit Ass'n v. Dobrovolny*, 415 N.W.2d 489, 491 (N.D.1987); *First Nat'l Bank of Crosby v. Bjorgen*, 389 N.W.2d at 794. The "subject matter jurisdiction of a district court is not determined by whether or not it correctly applied a statute to a particular cause of action because, to hold otherwise, would vest subject matter jurisdiction in a district court subject to divestment upon an erroneous ruling." *Production Credit Ass'n v. Dobrovolny*, 415 N.W.2d at 491. An error of law in the proceedings may furnish grounds for appeal but it does not invalidate the judgment.

In *Northwestern Nat'l Life Ins. Co. v. Delzer*, 425 N.W.2d at 368, we held that strict compliance with the notice before foreclosure required by NDCC 32–19 is not a prerequisite to a district court's exercise of jurisdiction in a foreclosure and that a failure to so comply did not make a judgment void and vulnerable under Rule 60(b). In *Production Credit Ass'n v. Dobrovolny*, 415 N.W.2d at 492, we similarly held that an allegation that a statutory redemptioner could not lawfully buy a sheriff's certificate from the purchaser at a foreclosure sale, even if legally correct, did not mandate Rule 60(b) relief. We also held in *First Nat'l Bank of Crosby v. Bjorgen*, 389 N.W.2d at 794, that a judgment is not void under Rule 60(b) merely because the creditor allegedly failed to comply with the anti-deficiency judgment statutes. These decisions illustrate that a legal error alone does not make a judgment void.

Like the statutes arguably misapplied in these illustrative decisions, NDCC 28–23–07 and 1987 N.D.Sess.Laws Ch. 194 do not display an intent to limit a court's power in a jurisdictional sense. We conclude that these manner-of-sale laws, even if violated,