Mary LEADBETTER, Plaintiff and Appellant,

v.

Richard ROSE, Ph.D., Defendant,

and

University of North Dakota, Defendant and Appellee.

Civ. No. 900200.

Supreme Court of North Dakota.

March 19, 1991.

Shirley A. Dvorak (appearance), Mack, Moosbrugger, Ohlsen, Dvorak & Carter, Grand Forks, for plaintiff and appellant. Argued by Leann Bertsch, 3rd Year Law Student.

Janet Seaworth (argued), Bismarck, for defendant and appellee. Appearance by Gary R. Thune, Sp. Asst. Atty. Gen., Bismarck.

ERICKSTAD, Chief Justice.

Mary Leadbetter appeals from a judgment dismissing, on the grounds of sovereign immunity, her action against the University of North Dakota [UND]. We affirm.

Leadbetter, a physiology student at UND, sued UND and Dr. Richard Rose, the chairman of the physiology department at UND, alleging that Rose sexually assaulted her while they were attending a meeting of the Federation of American Societies for Experimental Biology in New Orleans in March 1989. She alleged that UND breached its duty to investigate her complaint and to provide her with a safe school environment and supervisors. UND moved to dismiss Leadbetter's action on the grounds of sovereign immunity. The district court granted the motion, concluding that sovereign immunity barred Leadbetter's action against UND. Leadbetter appealed.[1]

Leadbetter argues that UND is not an arm of the State of North Dakota and therefore sovereign immunity does not bar her action. UND responds that the State of North Dakota is the real party in interest.

When an action is essentially against the state to recover money, the state is the real party in interest and is entitled to invoke sovereign immunity even though it is not a named defendant. *Kristensen v. Strinden*, 343 N.W.2d 67 (N.D. 1983). A court may look beyond the nominal parties to determine whether or not the state is the real party in interest. *Id.*

A majority of courts that have considered the relationship of a state university to its state have concluded that, for purposes of the Eleventh Amendment,[2] a suit against the university is a suit against the state. *Durham v. Parks*, 564 F.Supp. 244 (D.C.Minn.1983); *Vaughn v. Regents of University of California*, 504 F.Supp. 1349 (E.D.Cal.1981) and cases cited therein. The status of a state university depends upon the individual circumstances of each case. *Durham, supra; Vaughn, supra.*

The most important circumstance in determining the status of a state university is whether a judgment against that university will be paid from the state treasury. *Durham, supra; Vaughn, supra.* Other circumstances include: (1) whether the university is performing a governmental or proprietary function, (2) whether the university is separately incorporated, (3) whether the university can sue and be sued and enter into contracts, (4) whether the state controls the university's operations, and (5) whether the state has immunized itself from responsibility for the university's operations. *Id.* We examine the relationship of UND to the State of North Dakota.

N.D. Const., Art. VIII, § 2, requires the Legislature to establish a uniform sys-

---

**1.** The district court has entered a Rule 54(b), N.D.R.Civ.P., certification.

**2.** U.S. Const., Amend. XI, provides:
"The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."
In *Kristensen, supra,* 343 N.W.2d at 72, n. 4, we said that the basic principles relating to nominal and real parties in interest in North Dakota are substantially similar to Eleventh Amendment analysis.

tem of public schools, including schools of higher education.

N.D. Const., Art. VIII, § 5, provides:

"All colleges, universities, and other educational institutions, for the support of which lands have been granted to this state, or which are supported by a public tax, shall remain under the absolute and exclusive control of the state...."

N.D. Const., Art. VIII, § 6, provides, in relevant part:

"1. A board of higher education, to be officially known as the state board of higher education, is hereby created for the control and administration of the following state educational institutions, to wit:

"a. The state university and school of mines, at Grand Forks, with their substations.

    \*       \*       \*       \*       \*       \*

"2. a. The state board of higher education shall consist of seven members, all of whom shall be qualified electors and taxpayers of the state, and who shall have resided in this state for not less than five years immediately preceding their appointment, to be appointed by the governor, by and with the consent of the senate, from a list of names selected as hereinafter provided."

*See also* Sections 15–10–01 and 15–10–02, N.D.C.C.

The State Board of Higher Education is a part of the executive branch of government. *See Nord v. Guy,* 141 N.W.2d 395 (N.D.1966). The appointment of the Board of Higher Education by the governor with the consent of the Senate is indicative of the State's retention of a measure of control over the governing body of UND. *See Vaughn, supra,* 504 F.Supp. at 1353. The State's control over the Board is further demonstrated by the Legislature's requirement for the Board to make biennial reports to the governor and the office of management and budget about enrollments, major functions and programs, major goals and objectives, and finances. Section 15–10–14.1, N.D.C.C. The Board is also required to obtain approval of the bud-get section of the legislative council to construct buildings and campus improvements which are financed by donations, gifts, grants, and bequests. Section 15–10–12.1, N.D.C.C. The Board may not spend more money than appropriated by the Legislature for the erection or improvement of any public building, or structure, or for the purchase of any real property [Section 54–27–12, N.D.C.C.], or divert money appropriated by the Legislature for one institution to another institution. Section 15–10–16, N.D.C.C. The members of the Board are compensated by the State for time actually devoted to the duties of the office and receive necessary expenses "in the same manner and amounts as other state officials." Section 15–10–08, N.D.C.C.

Although the Board has authority over some aspects of UND [Section 15–10–11, N.D.C.C.], our constitution and statutes indicate that UND ultimately remains under the control of the State. *Compare Durham, supra,* 564 F.Supp. at 248, ["Minnesota constitution has significantly put the University [of Minnesota] out of reach of the control of the state"].

Leadbetter also asserts that UND generates revenue from sources other than legislative appropriations and that a judgment against UND "need not and in fact most likely would not come from the state treasury." However, UND relies upon some legislative appropriations for its support and to the extent that any judgment obtained by Leadbetter would be satisfied out of funds derived from those appropriations, that judgment would be from the State treasury. *Vaughn, supra.* Moreover, we agree with *Vaughn, supra,* that the proper inquiry is whether any judgment will have to be paid out of the State treasury or other sources of State funds; *i.e.,* funds otherwise available to the State. Section 15–10–12, N.D.C.C., provides that "[a] special revenue fund, for each institution of higher education under the control of the [state] board [of higher education] or subject to its administration, shall be maintained within the state treasury and all institutional income and institutional collections of public funds of each institution,

... shall be placed in the special fund for the use of the institution for which the money was raised." Money received by UND is part of the State fund for use by UND. Any judgment against UND would therefore come from the State treasury or other sources of State funds.

These factors lead us to conclude that UND is an arm of the State of North Dakota and is therefore entitled to invoke sovereign immunity as a bar to Leadbetter's lawsuit.

Leadbetter argues that this court should abrogate or modify the doctrine of sovereign immunity. She contends that the original reasons for the doctrine no longer exist and that no sufficient reason exists to retain it. Relying on *Kitto v. Minot Park District*, 224 N.W.2d 795 (N.D.1974), she asserts that because sovereign immunity is a product of judicial origin, this court may abrogate or modify it.

Art. I, § 9, N.D. Const., provides:

"All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay. Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct."

In *Kitto*, this court, within certain limits, abolished the judicial doctrine of immunity for governmental bodies. We held that governmental bodies, other than the State, could be sued for damages for negligence, wrongful acts, or omissions of their agents and employees. We defined governmental bodies as counties, townships, park districts, school districts, cities, and other local governmental or political subdivisions. In analyzing the extent to which governmental immunity was based upon the predecessor of Art. I, § 9, N.D. Const., we said that "a reconsideration of the constitutional basis for governmental immunity establishes that this doctrine, as distinguished from sovereign immunity of the state itself, is not constitutionally mandated." *Kitto, supra,* 224 N.W.2d at 801. *Kitto* was thus specifically limited to governmental immunity and not sovereign immunity.

In *Senger v. Hulstrand Construction, Inc.,* 320 N.W.2d 507 (N.D.1982), this court considered whether or not sovereign immunity could be judicially abrogated. We observed that Art. I, § 9, N.D. Const., had been consistently construed as giving the Legislature the power to modify or waive sovereign immunity. In analyzing that constitutional provision and its effect on the abrogation or modification of sovereign immunity, we considered *Mayle v. Pennsylvania Dept. of Highways,* 479 Pa. 384, 388 A.2d 709 (1978), and *Worthington v. State,* 598 P.2d 796 (Wyo.1979), and construed

"Article I, § 9, of the North Dakota Constitution as a delegation to the Legislature of the power to regulate the State's [amenability] to suit and not as an invitation to the court to invade that domain. *See Worthington, supra* 598 P.2d at 804.

\* \* \* \* \* \*

"Article I, § 9 of the North Dakota Constitution entrusts the matter of sovereign immunity to the Legislative Assembly." *Senger, supra,* 320 N.W.2d at 510.

We therefore declined to judicially abrogate sovereign immunity, and we have consistently adhered to that decision. *Schloesser v. Larson,* 458 N.W.2d 257 (N.D.1990); *Dickinson Public School District v. Sanstead,* 425 N.W.2d 906 (N.D.1988); *Kristensen v. Strinden,* 343 N.W.2d 67 (N.D. 1983); *Patch v. Sebelius,* 320 N.W.2d 511 (N.D.1982). We are not persuaded that those recent decisions should be revisited, and we reaffirm that Art. I, § 9, N.D. Const., delegates the matter of sovereign immunity to the Legislature.[3] *See Doe v.*

---

**3.** Other courts have held that similar constitutional provisions are not self-executing and require legislative action to maintain a suit against the state. *See Worthington v. State, su-* *pra.* Our Legislature has provided for some actions against the State.

Section 32–12–02, N.D.C.C., provides:

"*Action against state—When authorized—Where brought—Undertaking for costs.* An ac-

*Cates,* 499 A.2d 1175 (Del.1985); *Crowder v. Dept. of State Parks,* 228 Ga. 436, 185 S.E.2d 908 (1971); *Worthington v. State, supra.*

■ Leadbetter nevertheless argues that the open courts provision of Art. 1, § 9, N.D. Const., "refers in absolute terms to the unequivocal right of every person to achieve justice and to have a remedy for the wrongs suffered by that person 'without denial.'"

However, in other contexts, we have said that our open courts provision is not absolute and does not require a remedy for every alleged wrong. *Hanson v. Williams County,* 389 N.W.2d 319 (N.D.1986); *Andrews v. O'Hearn,* 387 N.W.2d 716 (N.D. 1986). In the context of suits against the State, the second sentence of Art. I, § 9, N.D. Const., specifically limits the first sentence by entrusting the matter of sovereign immunity to the Legislature. Leadbetter's argument ignores that limiting language and our rule of construction that we give each sentence, clause, and phrase of a provision meaning, whenever fairly possible. *County of Stutsman v. State Historical Society,* 371 N.W.2d 321 (N.D.1985). Leadbetter's argument is also contrary to *Senger, supra,* and our subsequent decisions that sovereign immunity is entrusted to the Legislative Assembly. We conclude that sovereign immunity does not violate the "open courts" provision of Art. I, § 9, N.D. Const.

■ Leadbetter also argues that absolute sovereign immunity violates the equal protection clause of the United States[4] and the North Dakota Constitutions.[5] She asserts that sovereign immunity creates an impermissible discriminatory classification between individuals injured by State tortfeasors and by private tortfeasors.[6] She

---

tion respecting the title to property, or arising upon contract, may be brought in the district court against the state the same as against a private person. Such actions shall be brought in the county in which the property is situated, or the county in which the plaintiff resides. The plaintiff at the time of commencing such action shall file an undertaking with sufficient surety to be approved by the clerk of court to the effect that he will pay any judgment for costs that may be rendered against him."

However, Section 32–12.1–03(4), N.D.C.C., deals with sovereign immunity for torts and provides:

"*32–12.1–03. Liability of political subdivisions—Limitations.*

\* \* \* \* \* \*

"4. The sovereign immunity of the state is not waived in any manner by this chapter, and this chapter shall not be construed to abrogate the immunity of the state."

4. U.S. Const., Amend. XIV, § 1, provides, in part:

"nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

5. N.D. Const., Art. I, § 21, provides, in part:

"nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

6. Leadbetter also asserts that Section 15–10–17.-2, N.D.C.C., creates an impermissible discriminatory classification between seriously injured and slightly injured tort victims. That statute provides:

"*15–10–17.2. Claims against institutions of higher education—Continuing appropriation.* Any individual injured by an employee of a public institution of higher education may submit a claim to the president of the institution. As used in this section, 'claim' means a monetary demand upon the state for physical injury or property damage arising from activities of an employee of a public institution of higher education. The institution, upon approval of the state board of higher education, may approve and pay a claim for less than one thousand dollars. If the claim is approved, and if there are funds available for payment, the funds are hereby appropriated for that purpose. This section is not a waiver of any sovereign immunity of the state."

That statute was enacted in 1989 after the alleged conduct involved in this case, and it is not applicable to this action. Section 1–02–10, N.D. C.C.; *Reiling v. Bhattacharyya,* 276 N.W.2d 237 (N.D.1979). Moreover, partial legislative waivers of sovereign immunity on the basis of the amount of a claim have been widely upheld against equal protection challenges. *E.g., Smith v. City of Philadelphia,* 512 Pa. 129, 516 A.2d 306 (1986); *Stanhope v. Brown County,* 90 Wis.2d 823, 280 N.W.2d 711 (1979). We rejected a parallel argument about the purchase of insurance in *Patch v. Sebelius,* 320 N.W.2d 511 (N.D. 1982).

Leadbetter also argues that Section 32–12.1–15(2), N.D.C.C., violates equal protection because a state employee may not be sued in the employee's personal capacity for ordinary negli-

also argues that the State cannot hold its political subdivisions to a higher standard of liability than it holds itself.

In *Kavadas v. Lorenzen,* 448 N.W.2d 219, 221–222 (N.D.1989), we recently reviewed our standards for analyzing equal protection claims:

"Our standard of review for analyzing equal protection claims depends on the right allegedly infringed upon by the challenged legislative classification. We apply strict scrutiny to legislative classifications that are inherently suspect or infringe upon fundamental rights, and we strike down the challenged classification unless it promotes a compelling government interest and the distinction drawn is necessary to further its purpose.... If a legislative classification infringes upon important substantive rights, we apply an intermediate standard of review, and we uphold the classification if it bears a close correspondence to the legislative goals.... We apply a rational basis test to legislative classifications that are not inherently suspect, or do not infringe upon fundamental or important substantive rights, and we uphold the classification unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose...." [Citations omitted.]

*See also Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988).

■ Although Leadbetter claims that sovereign immunity creates an "invidious classification," she has cited no persuasive authority for that claim or for the proposition that sovereign immunity violates the equal protection clause of the United States Constitution. It has generally been held that the doctrine of sovereign immunity and classifications under that doctrine are rationally related to legitimate government interests and therefore do not violate equal protection. *Crowder v. Dept. of State Parks,* 228 Ga. 436, 185 S.E.2d 908 (1971); *Sousa v. State,* 115 N.H. 340, 341 A.2d 282 (1975); *Hutchinson v. Board of Trustees of University of Alabama,* 288 Ala. 20, 256 So.2d 281 (1971); *Winston v. Reorganized School Dist. R–2,* 636 S.W.2d 324 (Mo.1982). We conclude that, under the rational basis test, sovereign immunity does not violate the equal protection clause of the Fourteenth Amendment to the United States Constitution.

In *Patch v. Sebelius,* 320 N.W.2d 511 (N.D.1982), we applied the intermediate level of scrutiny to a classification based upon sovereign immunity and held that a statute conditioning a tort victim's right to recover from the State upon the State's purchase of liability insurance[7] had a sufficiently

---

gence whereas a private employee may be sued for ordinary negligence. Section 32–12.1–15(2), N.D.C.C., provides:

"2. No employee of the state may be held liable in the employee's personal capacity for actions or omissions occurring within the scope of the employee's employment unless such actions or omissions constitute reckless or grossly negligent conduct, malfeasance, or willful or wanton misconduct."

That language was enacted in 1987 N.D.Sess. Laws, ch. 351, to raise the level of immunity for State employees sued in their personal capacity. February 2, 1987 Minutes of Senate State and Federal Government Committee regarding HB 1446. *Compare Fischer v. Knapp,* 332 N.W.2d 76 (N.D.1983). However, Leadbetter's complaint does not allege ordinary negligence by any identified State employee, and she therefore lacks standing to raise this issue. *Hovet v. Hebron Public School District,* 419 N.W.2d 189 (N.D.1988); *State v. Gamble Skogmo, Inc.,* 144 N.W.2d 749 (N.D.1966). Moreover, she has not raised sufficiently "weighty countervailing poli-

cies" for us to depart from this rule. *Hovet, supra.*

**7.** Section 32–12.1–15, N.D.C.C., provided:

"*32–12.1–15. State agencies authorized to purchase insurance.*

" '1. The state or any state agency, bureau, or department may insure against liabilities provided by this chapter for its own protection and for the protection of any state employee. If a premium savings will result therefrom, the policies of insurance may be taken out for more than one year, but in no event beyond a period of five years.

" '2. If the state or any state agency, bureau, or department shall purchase insurance pursuant to this section, the purchaser shall waive its immunity to suit only to the types of insurance coverage purchased and only to the extent of the policy limits of the coverage. Provided, the purchaser or its insurance carrier is not liable for claims arising out of the conduct of a ridesharing arrangement, as defined in section 8–02–07....' " *Patch v. Sebelius, supra,* 320 N.W.2d at 512, n. 2.

close correspondence to limited legislative goals to satisfy the equal protection clauses of both the State and Federal Constitutions. When as here, an argument is inferentially made that one part of our State Constitution violates another part of our State Constitution, we must consider the entire Constitution. *State ex rel. Sanstead v. Freed,* 251 N.W.2d 898 (N.D.1977). Considering the entire Constitution we conclude that sovereign immunity is an equal part of our State Constitution and therefore does not violate another equal part of that Constitution. *State v. Rivinius,* 328 N.W.2d 220 (N.D.1982), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983).

■ Leadbetter also contends that sovereign immunity unduly impinges on her right to travel and places an undue burden on interstate commerce under the United States Constitution. However, she has cited no persuasive authority for those arguments.

Relying upon Justice Brennan's dissent in *Welch v. Texas Dept. of Highways and Public Transportation,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987), Leadbetter also contends that the First [8] and Fourteenth Amendments of the United States Constitution negate the Eleventh Amendment requirement that a State must consent to a suit by one of its own citizens. Leadbetter's argument ignores that a plurality in *Welch* did not overrule *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), and the principle that the Eleventh Amendment of the United States Constitution bars a citizen from bringing suit against that citizen's own state in federal court unless the state waives its immunity and consents to suit in federal court. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Our interpretation of Art. I, § 9, N.D. Const., for suits in state court is consistent with the United States Supreme Court's interpretation of the Eleventh Amendment to the United States Constitution for suits in federal court.

Finally, we believe the following comments by the Georgia Supreme Court in *Crowder v. Dept. of State Parks, supra,* 185 S.E.2d at 911, are applicable to sovereign immunity in North Dakota:

> " 'If this is a harsh rule, and if it does not have the approval of the people of the State, there is a definite way, a plain way, and a legal way, whereby it can be changed. This court has always held that the State could expressly consent to be sued. Therefore a very simple and brief enactment of the legislature giving this consent is all that is required in order to permit a suit against the State.' "

*See also Best Products Co., Inc. v. Spaeth,* 461 N.W.2d 91 (N.D.1990).

The district court judgment is affirmed.

GIERKE and VANDE WALLE, JJ., concur.

MESCHKE, Justice, dissenting.

Because I believe that no part of state government is above or beyond the law, I respectfully dissent.

Years ago, this court "solicit[ed] legislative action" on the "matter of sovereign immunity of the state itself." *Kitto v. Minot Park District,* 224 N.W.2d 795, 803 (N.D.1974). "The injustices of state immunity remain for one who is injured by the wrongful act of the state government." *Id.* Those injustices remain still.

When government is not governed by the same laws as its citizens and private institutions, it is troubling. Sovereign immunity is a hallmark of a totalitarian form of government, not of a constitutional democracy, as recent events in eastern Europe tend to evidence. *Schloesser v. Larson,* 458 N.W.2d 257 (N.D.1990) (Meschke, Justice, dissenting). "These outmoded and undemocratic concepts ['sovereign and governmental immunities'], buttressed on most dubious foundations, have no place—as a

---

**8.** U.S. Const., Amend. I, provides, in part: "Congress shall make no law ... abridging ... the right of the people ... to petition the

government for a redress of grievances."

matter of law apart from deliberate local legislative or constitutional policies—in a free society where government is the servant of the people—not their master." 2 S. Speiser, C. Krause & A. Gans, The American Law of Torts § 6:1, p. 10 (1985) [hereinafter American Law of Torts]. Sovereign immunity saves a state fiscal inconvenience through injustice to individuals.

In my separate opinions in *Schloesser v. Larson* and in *Dickinson Public School District v. Sanstead,* 425 N.W.2d 906, 910 (N.D.1988), I detailed my reasons for concluding that sovereign immunity is textually unfounded, lacks historical accuracy, and is judicially irrational. I will not repeat my reasons here, but only reiterate that "[i]t does not make sense to read the subordinate sentence in the 'open courts' Declaration [of Rights, N.D. Const. art. I, § 9] as supervening the meaning of the declared rights." *Schloesser,* 458 N.W.2d at 262. *See also* N.D. Const. art. I, § 24 ("The provisions of this constitution are mandatory and prohibitory unless, by express words, they are declared to be otherwise"). What good is constitutional assurance that "every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law," if not for protection from government?

Today's opinion upholds sovereign immunity on precedent, not on reason. ("[W]e have consistently adhered to that decision"). "But stare decisis is no more a barrier to judicial reconsideration of the 'injustices of state immunity' than to abrogation of governmental immunity for the political subdivisions of the state. *Kitto v. Minot Park District,* 224 N.W.2d 795, 802–03 (N.D.1974). Unjust and unsupportable interpretations should be reconsidered." *Schloesser,* 458 N.W.2d at 261 (Meschke, Justice, dissenting). Many "courts, following long and arduous weighing of of [sic] the various policy factors, have judicially abolished such immunity for reasons already stated of anachronism and historical inaccuracy, of unsuitability to democratic American institutions, as unfitting modern notions of social justice to injury victims." 2 American Law of Torts § 6:7, pp. 38–39 (footnotes omitted). This court has on oc-

casion reconsidered and overruled other past precedents when important. *Otter Tail Power Co. v. Von Bank,* 72 N.D. 497, 8 N.W.2d 599 (1942); *Iverson v. Lancaster,* 158 N.W.2d 507 (N.D.1968); *Melland v. Johanneson,* 160 N.W.2d 107 (N.D.1968). Today's decision scarcely reconsiders, but rather simply perpetuates precedent.

The only added rationalization in today's decision, that the majority's interpretation "is consistent with the United States Supreme Court's interpretation of the Eleventh Amendment to the United States Constitution for suits in federal court," is puzzling. It is agreed among all concerned with confused federal procedure that the "Eleventh Amendment does not apply in state courts." *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 2307, 105 L.Ed.2d 45 (1989) (Justice White for a five Justice majority) and 109 S.Ct. at 2312 (Justice Brennan for a four Justice minority). *Compare Howlett v. Rose,* —— U.S. ——, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). The Eleventh Amendment only reduces a state's responsibility in federal courts; it does not enshrine the sovereign immunity of any state.

Law equally applicable to citizen and government alike could acquit the University from any liability in this kind of case. A principal is not usually liable for an intentional tort committed by an agent acting outside the scope of employment, as where the agent acts for his own personal gratification and adversely to the principal. *See* 3 Am.Jur.2d *Agency* § 280 (1986). While there are factual elements in this defense (and perhaps a qualification if the principal knows of the agent's wayward propensities), equal application of the law would often avoid the liability of a principal for an errant agent. *See Lyon v. Carey,* 533 F.2d 649 (D.C.Cir.1976) (Question for jury whether rape by deliveryman stemmed from personal purpose or arose from trucking company's business, but affirmed JNOV for store that sent the bed for delivery). *Compare Marston v. Minneapolis Clinic of Psychiatry,* 329 N.W.2d 306 (Minn.1982); *Binstock v. Fort Yates Public School District No. 4,* 463 N.W.2d 837

(N.D.1990). Unfortunately, the judicial branch again chooses to immunize a part of government from generally applicable law.

For these reasons, I respectfully dissent.

LEVINE, J., concurs.